**Herbert MUSCHEL et al., Plaintiffs,**

v.

**WESTERN UNION CORPORATION et al., Defendants.**

Court of Chancery of Delaware.

Aug. 10, 1973.

David A. Drexler, and William H. Sudell, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, and Howard G. Kristol, of Royall, Koegel & Wells, New York City, for plaintiffs.

Richard F. Corroon of Potter, Anderson & Corroon, Wilmington, and Milton Black, and John J. Witmeyer, III, of Mudge, Rose, Guthrie & Alexander, New York City, for defendants Western Union Corp. and Regrem, Inc.

Arthur G. Connolly, Jr., of Connolly, Bove & Lodge, Wilmington, and Robert L. Meyers, III, and Charles R. Johnson of Stalcup, Johnson, Meyers & Miller, Dallas, Tex., for defendant National Sharedata Corp.

BROWN, Vice Chancellor:

Plaintiffs are the record owners of 83,920 shares of the Defendant Western Union Corporation (hereafter referred to as Western Union) and claim to bring this action individually, derivatively on behalf of and for the benefit of Western Union, and representatively on behalf of all other shareholders of Western Union similarly situated. The Defendant Western Union and the Defendant Regrem, Inc. a wholly-owned subsidiary of Western Union are corporations of the State of Delaware as is the Defendant National Sharedata Corporation (hereafter referred to as NSC). NSC is primarily engaged in providing data processing management services to commercial banking institutions. On or about April 16, 1973, it was announced by Western Union that it had agreed in principle to acquire NSC through an exchange of securities.

By agreements dated May 25, 1973, Western Union, Regrem and NSC agreed to a plan of merger under which Regrem would merge into NSC, with NSC thereafter being the surviving corporation and thus a wholly-owned subsidiary of Western Union. As part of this merger Western

Union is to issue approximately 880,000 shares of its common stock to the shareholders of NSC with the agreed upon exchange ratio being 0.387 of a share of Western Union common stock for each of 2,278,727 shares of NSC common stock then outstanding. Based on the closing sale price for Western Union common stock on April 13, 1973, the shares to be received by the shareholders of NSC had a total value of approximately $23.5 million. The Western Union shares to be issued under the proposed merger would constitute about 7 percent of the presently outstanding shares of Western Union. In this reverse three-party merger Western Union, through its board of directors, provides stockholder approval for Regrem and therefore no approval of the transaction has been sought from the shareholders of Western Union.

This action was filed on July 23, 1973. On or about July 26, 1973, Plaintiffs through counsel delivered a letter to counsel for the individual directors of Western Union demanding that the directors reconsider the proposed merger in light of the matters alleged in the complaint. The Western Union board thereafter met again on July 24, 1973, but still elected to go forward with the merger. Stockholder approval by NSC occurred on August 6, 1973 and therefore the merger can be completed by the filing of the necessary certificate with the Secretary of State on or before August 16, 1973. Plaintiffs seek a preliminary injunction to prevent this from happening.

In support of its demand for a preliminary injunction, Plaintiffs advance three main arguments. First, they argue that if the merger is permitted, its effect will be to place almost one million shares of Western Union stock in the hands of certain present NSC stockholders who can thereupon be presumed to be friendly to the present management of Western Union. Thus they say that the merger is designed to this extent to issue stock in Western Union for control purposes so as to insure the retention of present management and directors of Western Union. As a result, they contend that the transaction is tainted with self-interest on the part of the board of Western Union which shifts the burden to the board to demonstrate the intrinsic fairness of the merger, Condec Corporation v. Lunkenheimer Company, Del.Ch., 220 A.2d 769 (1967), and that consequently the injunction should issue until such time as a determination can be made on this point.

Secondly, they contend that certain material information was not correctly given to the Western Union board when the merger plan was presented, and that consequently they cannot have performed their fiduciary obligation as directors to make an *informed* judgment in approving the merger. Kaplan v. Centex Corp., Del.Ch., 284 A.2d 119 (1971).

Thirdly, Plaintiffs point out that under the three-party agreement by which Western Union is to acquire NSC it is provided that Western Union is free to abandon the transaction with no legal obligation in the event that litigation is commenced by stockholders of Western Union to restrain consummation of the merger. They say that under Delaware law, when fiduciaries are afforded a means to get out of a commitment, or to get a better deal, they are under an obligation to consider it. Wilmington Trust Co. v. Coulter, Supr.Ct., 200 A. 2d 441 (1964). This, they contend, the Western Union board refused to do, even though the directors again convened on July 24, 1973, the day after this action was filed, to consider the effect of the suit.

Finally, throughout all their arguments, is the underlying premise that Western Union is paying a greatly excessive price for NSC. By example, they point out that according to the prospectus figures (a) by respective market value of the securities involved Western Union is paying $23.5

million for NSC stock worth $16 million; (b) that based on a price-earnings comparison for the past fiscal year of NSC, Western Union is paying at 60–1 ratio; and (c) that based on a comparison of the book value of assets to be acquired Western Union is issuing shares worth $23.5 million to acquire assets of approximately $1.7 million.

Western Union answers their contentions by pointing out through various affidavits that the proposed acquisition of NSC was not a hastily concocted plan as claimed by Plaintiffs, but rather was the end result of an exhaustive and thorough study undertaken pursuant to the decision of Western Union in 1971 to concentrate on a general strategy of acquisitions of small companies to be used as a springboard to future expansion in the area of computer information services to the commercial banking industry. During this course of activity it screened hundreds of companies and obtained an analysis and report from an internationally known management consulting firm of wide experience. NSC emerged as one of the few companies most highly recommended for acquisition. Negotiations with NSC ensued and eventually an acquisition price was agreed upon which was well within the "ball park" figure established by Western Union for this purpose.

Evidence was further offered to show that after the agreement in principle was reached in mid-April 1973, Western Union undertook further examination and evaluation of NSC in substantial detail which covered the financial, operational, technical, organizational and customer relations aspects of the business structure of NSC. Thereafter, a claimed full presentation was made to the Western Union board and the merger approved on May 22, 1973.

Western Union acknowledges that it is paying a premium to NSC stockholders of some 45 percent and that there will be an initial dilution of Western Union stock of 11.6 cents per share. It offers evidence, however, to show that such a premium is not unrealistic in a merger of this type wherein a going concern is being acquired for immediate entry into a new field for the purpose of future growth, and also offers projections which indicate $7 per share earnings for the combined Western Union—NSC operation by 1978.

It is on these considerations, as amplified in great detail by the affidavits and exhibits of record, that the present determination must be made. Taking them in order I feel that I must reach the following conclusions.

### A.

First of all, I am not satisfied from the present status of the record that a sufficient showing of self-interest or self-dealing has been made so as to shift the burden of proving the fairness of the merger upon the Western Union board of directors. In his testimony, Daniel B. Stuart, president of NSC and one of its largest stockholders, was asked specifically if he had any verbal or written agreement with any officer, director or member of management of Western Union to vote the shares of stock he would receive as a result of the merger in favor of either management or the present board of directors of Western Union. His answer was in the negative. He further stated that he was not aware of any stockholder of NSC, either major or minor, who had any such arrangement. Plaintiffs can offer no evidence of any such subterfuge at this point.

While it is true, as Plaintiffs point out, that certain large NSC stockholders have formally agreed to vote their shares in favor of the merger, it does not seem unreasonable to secure such a commitment before entering into the cumbersome and expensive merger procedure, and this fact, even coupled with the opinion of Plaintiffs that the premium being paid for the shares is excessive, should not give rise to a pre-

sumption of self-dealing. At least, I do not feel that it does so here.

## B.

■ This being the case, I am of the opinion that the business judgment rule is the standard that must be applied, and that consequently the burden is on Plaintiffs to establish some fraud, or what amounts to fraud, on the part of Western Union in order to prevail at this stage of the proceedings. It is well established that in order to enjoin a proposed merger on the theory of constructive fraud based on a claimed discriminatory undervaluation or overvaluation of corporate assets, it must be plainly demonstrated that the overvaluation or undervaluation, as the case may be, is such as to show a conscious abuse of discretion before fraud at law can be made out. Cole v. National Cash Credit Ass'n, 18 Del.Ch. 47, 156 A. 183 (1931).

■ Mere inadequacy of price will not reveal fraud, but rather the disparity must be so gross as to lead the Court to conclude that it was not due to an honest error of judgment, but rather to bad faith, or to reckless indifference to the rights of others interested. Wide discretion in the matter of valuation is confided to directors, and as long as they appear to act in good faith, with honest motives, and for honest ends, the exercise of their discretion will not be interfered with. Cole v. National Cash Credit Ass'n, supra.

■ Finally, as most recently as stated in Sinclair Oil Corporation v. Levien, Del. Supr., 280 A.2d 717 (1971):

"A board of directors enjoys a presumption of sound business judgment, and its decisions will not be disturbed if they can be attributed to any rational business purpose. A court under such circumstances will not substitute its own notions of what is or is not sound business judgment."

Plaintiffs do not dispute these principles, but argue that the business judgment rule does not come into effect where it appears that not all material facts concerning the transaction were presented to the board. They claim that during discovery, and subsequent to the filing of suit, it has been learned that two critical factors related to a proper evaluation of NSC were not brought to the attention of the Western Union board. First, the board was not advised that NSC by its own admission had a practice, at least until February 1972, of issuing stock options and warrants to prospective customers in order to induce them to enter into long-term contractual relationships with NSC. Second, the board was not advised that a certain 5 year projection of revenues and earnings of NSC which was presented to the board was substantially inflated from similar projections prepared by the management of NSC.

On the other hand, the present record contains evidence that Mr. Finney, the official making the merger presentation to the board, personally investigated the stock option area and ascertained that although options had originally been demanded from and given by NSC after it commenced business in 1969, only two options were ever picked up by its customers (and one only partially) and only one other was still in effect. All other options originally given to obtain business had expired without being exercised. He further learned that NSC had not given any such options to customers since February 1972, and further, in view of the development of its business, it did not anticipate giving any in the future. Finney advised both Mr. McFall, Chairman of the Western Union board, and Mr. Evans, vice-president, secretary and general counsel, of this, but thereafter, on the assumption that the stock options were a thing of the past and therefore not material to the future potential of NSC, he made no mention of them in his presentation to the board. This

present status of the stock options was also verified by Mr. Stuart, president of NSC.

In addition, there is evidence that although the 5 year projection presented to the board was brighter than a separate 5 year projection prepared by NSC, the one presented to the board contemplated the 5 year potential of NSC after and as the result of the proposed merger with Western Union. In other words, the projection offered was premised on a combined effort of the resources of the merged companies, and was not intended to be a projection for NSC alone.

 Therefore, there is evidence in the record to indicate that what Plaintiffs feel to be critical was considered by others to be non-material for the reasons stated. There is also evidence that the allegedly inflated projection of NSC potential was not that at all. In view of this, I do not feel at this time that I can conclude that the Western Union board failed to make an informed judgment. I therefore feel, based on the present status of the record, that they are entitled to the presumption of having made an informed judgment in good faith which can be attributed to a rational business purpose.

### C.

As to Plaintiffs' last argument, pertaining to the escape clause in the merger agreement, namely, that the merger should be enjoined until such time as the Western Union board again convenes and considers the various material Plaintiffs may unearth during their discovery, I must note that as of this date Western Union has submitted an affidavit to the effect that such a meeting was held yesterday, August 9, 1973, and all matters heretofore raised by Plaintiffs were considered, including their amended complaint, trial brief and a transcript of the August 3rd hearing in this Court. It is therein recited that after full review, discussion and consideration, it was the unanimous vote of the directors present to approve the merger with NSC. Thus, Plaintiffs now are in the position of asking the Court to enjoin the merger until such time as the Western Union board does what, according to its affidavit, it did yesterday. Insofar as the application for an injunction rests on the refusal of the board to meet to consider withdrawal from the agreements, it seems to have vanished with the meeting.

### D.

In the rush toward the August 16th deadline, great pressure has been put upon both the Court and counsel, and counsel are to be commended for the excellent job they have done in presenting the matter under the circumstances. In fact documents are still on the way even as this opinion is being written. However, out of deference to the parties a cut-off must be established for the purpose of the preliminary injunction matter.

 Accordingly, based on the present status of the record and the arguments and authorities advanced, I am not satisfied that Plaintiffs have established such a probability of ultimate success as would justify the issuance of a preliminary injunction. David J. Greene & Co. v. Schenley Industries, Inc., Del.Ch., 281 A.2d 30 (1971). Therefore, the application for a preliminary injunction to prevent the filing of the documents necessary to consummate the merger is hereby denied. Counsel for Defendants are directed to present an order, on notice, by Monday, August 13, 1973, at which time any further application of the parties may also be considered.

In view of this decision and the obvious inadequacy of time, I make no determination at this point as to the procedural arguments set forth in the briefs.