Charles KAPLAN, Plaintiff,

v.

Robert S. GOLDSAMT, Bernard J. Korman, Alan B. Miller, Leonard W. Cronkhite, Jr., Thomas L. Kempner, Leonard M. Leiman, Louis Rones, J. Irving Schwartz, Joseph Ziegler and American Medicorp, Inc., Defendants.

Court of Chancery of Delaware, New Castle.

Submitted July 26, 1977.

Decided Oct. 20, 1977.

Joseph Rosenthal, of Morris & Rosenthal, Wilmington, and Mordecai Rosenfeld, New York City, for plaintiff.

Bruce M. Stargatt, and C. Vincent Scheel, of Young, Conaway, Stargatt & Taylor, Wilmington, for defendant Robert S. Goldsamt.

Charles S. Crompton, Jr., of Potter, Anderson & Corroon, Wilmington, for the remaining individual defendants.

Andrew B. Kirkpatrick, Jr., and Lawrence C. Ashby, of Morris, Nichols, Arsht & Tunnell, Wilmington, and Stephen R. Steinberg, and Joseph A. Clark, III, of Reavis & McGrath, New York City, for defendant American Medicorp, Inc.

BROWN, Vice Chancellor.

Plaintiff Kaplan, as a shareholder of the defendant American Medicorp, Inc. ("Medicorp") has sued derivatively on behalf of

the corporation seeking judgment in the form of money damages or, alternatively, rescission of an agreement and transaction whereby Medicorp, during the spring of 1976, purchased 550,000 shares of its own common stock from the defendant Robert S. Goldsamt for the sum of $5,225,000. Plaintiff also seeks to either set aside or obtain monetary redress with regard to a five-year consultation and noncompetition agreement entered into between Medicorp and Goldsamt as part of the same transaction under the terms of which Goldsamt received an additional sum of $275,000 in advance. The other individual defendants constitute the Board of Directors of Medicorp. Goldsamt too was a director at the time of the events complained of, although he resigned shortly thereafter pursuant to the terms of the transaction in issue. (For ease of reference, the individual defendants other than Goldsamt are hereafter referred to collectively as "the Board.")

Plaintiff originally based his suit upon the theory that Goldsamt, as a dominant shareholder of Medicorp, was guilty of fraudulent self-dealing in that he used his position to coerce the other members of the Board to approve the purchase of his shares at a price unfair to the corporation. Shortly before trial, however, plaintiff amended his complaint to charge that the defendant directors, while not subservient to Goldsamt, had improperly caused the corporation to buy his shares at an excessive price so as to prevent him from ousting them through a proxy fight and to thereby preserve their respective positions and business relationships with Medicorp. In particular, plaintiff contends that the proxy statement to shareholders which preceded shareholder approval of the purchase was materially false and misleading. Secondly, he contends that the per share price paid to Goldsamt for his stock was sufficiently excessive and unnecessary as to constitute a waste of corporate assets. It is on these latter two contentions that the decision on liability must turn.

At the outset I deem it appropriate to note that the "business relationships" to which plaintiff alludes are apparently based on the fact that the defendant Kemper was at the time the general manager of Loeb, Rhoades & Co. ("Loeb, Rhoades"), the investment banking firm utilized by Medicorp; that the defendant Miller was the salaried president of Medicorp in addition to being a member of the Board of Directors; that the defendant Leiman was and is a member of the New York law firm which represents Medicorp; and that all directors apparently received annual compensation for their services. From the evidence presented I find nothing to indicate that any of these defendant directors were at any time motivated in the actions taken by them by a desire to further private business interests unrelated to their status as directors of Medicorp.

I.

Turning to the facts of the matter, Medicorp was founded by Goldsamt and came into being through his efforts. Although only 38 years of age Goldsamt has already started three companies, one of which (Medicorp) went on the New York Stock Exchange. Another became listed on the London Stock Exchange and a third was sold into a combination on the American Stock Exchange. His strength appears to lie in converting ideas into going enterprises. He would appear to fit the description of a "promoter" in the purely corporate, legalistic sense of the word.

Medicorp is in the proprietary hospital business. In other words, it owns and operates hospitals. In addition it manages and leases other hospitals on a contract basis. During the 1960's Goldsamt was one of those who foresaw the business potential in hospital operations engendered through the Medicare program and related federal legislation. He was able to obtain sufficient financial backing to start Medicorp through the acquisition of three existing hospitals. Medicorp's initial public offering was made in 1968. Because federal regulations originally allowed a return on goodwill created by the difference between the purchase price and the book, or hard asset value of

the hospital acquired, Medicorp was able to grow rapidly during the latter 1960's, and, although revisions in applicable regulations eventually made it less desirable to acquire existing hospitals as a means of expansion, Medicorp has nonetheless risen to its present position wherein it employs some 13,000 persons and ranks among the top three or four proprietary hospital companies in the country. At the pinnacle of its rise, its stock was traded in excess of $40 per share on the New York Stock Exchange.

The change in the law which removed the goodwill advantage theretofore accompanying the acquisition of existing facilities eventually brought about a change in Medicorp's fortunes and dictated a change in its policy. The resultant inability to acquire quick assets gave the corporate enterprise a different outlook and caused the trading value of its stock to drop markedly. Management decided that Medicorp's future course would be best served if it turned to a policy which centered on the efficient operation of its facilities through the hiring of the best available personnel and the reduction of costs and overhead through a sharing of equipment among its hospitals and the large-lot purchase of supplies and materials. To this end, qualified and able employees were recruited for key management positions. Geographic areas were surveyed to ascertain hospital needs and new hospital facilities were constructed in some to either operate anew or in conjunction with existing small private operations acquired for that purpose.

This change in Medicorp's business approach paralleled a lessening of interest on the part of Goldsamt. He admittedly is not one who is interested in the day-to-day operation of a business—particularly that of Medicorp. Rather Goldsamt's main enthusiasm was directed toward the location and acquisition of properties on behalf of the corporation. With the end of the "acquisition game" brought about by the change in government policy, Goldsamt's interest in Medicorp waned and he began to look about for new ventures. Although he remained a director of Medicorp, he went to Europe for

some two years during which he evaluated prospects for a European hospital supply company. Undoubtedly, he also looked into many other things. But by and large his direct contact with Medicorp was limited to the formality of periodic director's meetings.

On returning from Europe in late 1974, Goldsamt, as well as the other directors, found that Medicorp's fortunes were turning around. To those in management, at least, the corporation's future outlook appeared to be brightening. At the same time its stock was trading at a comparatively low price—having reached a low at one point of less than $2 per share. It was felt by all that the stock was trading below its true value. Accordingly, a plan was adopted setting aside a fund to permit the corporation to purchase shares of its own stock on the open market so as to shrink its capital structure. It is within the area of this decision that Goldsamt developed a complete difference of opinion with his fellow members of the board. This difference of opinion is at the core of the present suit.

It was Goldsamt's view that the market price of Medicorp's stock was so low when compared to its actual worth that the corporation should use all possible cash and surplus to buy as much of it as legally possible, at least until such time as the trading price approached true intrinsic value. He considered any other use of available corporate assets to border on business madness. The remaining directors (with the possible exception of the defendant Korman), however, felt differently. They felt that the continued success of the enterprise depended upon the ability to retain key personnel. They believed that to devote all available assets to the acquisition of the corporation's own stock would produce economic stagnation and would conceivably indicate a future corporate policy leaning toward liquidation or sale of assets. It was felt that this type of atmosphere would be likely to cause many able employees to leave and seek positions elsewhere with growing and progressive organizations, thus undermining the very basis on which the existing

turnaround in fortunes was being accomplished. In short, the majority of the individual defendants felt that while it was advisable to devote some portion of corporate income to the purchase of the corporation's own stock, it was also vital that the larger portion by far be devoted to business growth and expansion of facilities.

This conflict between Goldsamt and the remainder of the Board became irreconcilable. During late 1974 through 1975, the issue was raised by Goldsamt in virtually all board meetings that he attended. As a personal trait, Goldsamt apparently has a penchant for unreserved self-expression that is on a par with his considerable business abilities. He was not above telling the other board members in unflattering terms precisely what he thought of their judgments on the point. During a December 1974 meeting he characterized them as "idiots" because of their proposal to build a new hospital in Louisville, Kentucky rather than to purchase Medicorp stock. As a result the plan was tabled and not approved until several months thereafter. His verbal remonstrations with the Board sometimes carried over to company personnel. As a precautionary measure, the Board eventually decided to change its alternate meeting site from Philadelphia, the home office of the corporation, to New York so as to avoid any adverse consequences on management's morale that Goldsamt's unrestrained airing of his views might have.

Against this backdrop, two subsequent meetings of the Board of Directors become significant for the purpose of this decision. At a meeting in September 1975, there was discussion about committing the corporation to a several million dollar hospital construction project in Brandon, Florida. Goldsamt again vigorously opposed this and made his usual argument in favor of stock acquisition. The discussion became heated and, as usual, unpleasant. The call for a vote produced a confrontation between Goldsamt and the others which was in no way lessened when the motion to build the new hospital carried over his objections. Goldsamt thereupon saw fit to announce, among other things, that through his own Medi-

corp holdings and those of others over which he had influence, he felt that he controlled 30 per cent of Medicorp's outstanding common stock, thereby indicating the possibility of a proxy fight to gain control of the corporation and to impose his business views on management. The other defendant members of the Board considered these remarks to have been made in anger and did not think that Goldsamt seriously intended a proxy fight. Some of them doubted the accuracy of Goldsamt's claim to control over 30 per cent of the stock. By his own admission, Goldsamt never pursued this threat (if, indeed, it was a threat). He took no steps in furtherance of a proxy fight. Nonetheless, as a precautionary measure, the defendant Miller, as corporate president, and with the knowledge of the defendant Kemper, (but without prior Board authorization) immediately retained at a cost of $30,000 the firm of Georgeson & Co. for the purpose of advising in the area of proxy solicitations. It also retained at a cost of $25,000 a New York law firm which specialized in proxy fight litigation.

The second significant meeting of the Board occurred on January 28, 1976. Again there was a discussion as to the cash forecast of the company and as to what to do with it. The subject again generated a fair amount of feeling. On this occasion Goldsamt specifically urged that consideration be given to making a tender offer for a large block of Medicorp stock. The other board members present were opposed to this, primarily because they felt, first, that the stock was worth more than its current selling price and, second, that it was also worth more than the price that would then be required to attract a substantial number of shares through a tender offer. Because they all agreed that they would not tender their own shares under such circumstances, they felt that it would be improper to ask public shareholders to sell their shares for a price considered to be unrealistically low by the Board itself. Goldsamt again made reference to the ultimate possibility of a proxy fight to resolve the impasse.

At the time, Medicorp shares were trading at 6⅞–7 on the market. During the debate about the advisability of a tender offer, Goldsamt was asked to identify a price at which he thought his recommended tender should be made. His response was $10.00 per share. Later, as the meeting was about to close, someone casually asked Goldsamt if he would be willing to sell his Medicorp holdings for $10.00 per share. He replied that he would. Prior to this time there had been no discussion by anyone concerning the possibility of Goldsamt selling his shares. In fact Goldsamt considered $10.00 to be a woefully inadequate price. His explanation for his impromptu decision is that he was fed up with the thinking of his fellow directors and that he wished no longer to be associated with the Board. In his words,

" . . . while I thought, frankly, that it was a miserable price, I thought at least I would have control of my own funds, and my history has been rather good with that."

Since Goldsamt was known to change his mind quickly, the Board immediately went into action. On the following day an executive committee of Kemper, Miller and Leiman met with Goldsamt and confirmed that he was indeed willing to sell. Effort was made to have him lower his price (both then and, later, by Leiman individually), but he would not budge on this point. He was then asked if he would be willing to act as a consultant to the corporation and not compete with it for a period of time. Goldsamt was receptive to this. It was then agreed between Miller, Kemper and Leiman that Leiman would research the various questions of law that might be involved and that Kemper would have Loeb, Rhoades consider the price factor.

On February 3 Leiman and an associate in his law firm met with Kemper and one of his partners from Loeb, Rhoades. It was reported that it was the feeling of Loeb, Rhoades that to acquire 550,000 shares other than through the purchase of Goldsamt's block would require a tender offer at a price of about $9.00 per share. To this would have to be added a soliciting dealer fee of $.40 per share, plus expenses of approximately $.10 per share.

On February 5, 1976 a quorum of Medicorp's Board (excluding Goldsamt who thereafter did not participate in discussions concerning the transaction) was convened and, based on reports given by Miller, Kemper and Leiman, and the discussion that followed it was agreed that the purchase of Goldsamt's shares at a price of $5,225,000 along with a five-year noncompetition and consultation agreement at $275,000 was a good opportunity for Medicorp which it could then afford and which would be of benefit to it.

Thereafter negotiations began between counsel for Goldsamt and representatives of Medicorp with respect to the terms and wording of the contracts. In this regard, Goldsamt insisted on a provision which would limit the sole remedy to that of rescission in the event the transaction should later be found improper for any reason by a court. His reasoning was that since he considered that he was selling his shares for less than their true worth, as he viewed them, he wanted under no circumstances to give up his stock and get less than the amount for which he had bargained. On March 4 the stock purchase agreement was executed. The consultation and noncompetition agreement was executed on March 12.

During the foregoing process the Board was made aware that the New York Stock Exchange felt that the matter should also be submitted to Medicorp's stockholders for approval. The Board did not feel that legally this was necessary, but it understandably agreed to do so. At a Board meeting on March 25 it was further agreed that an opinion in addition to that of Loeb, Rhoades should be obtained. The investment firm of Bache Halsey Stuart, Inc. ("Bache") was contacted and its subsequent opinion concurred with that of Loeb, Rhoades, namely that "it is reasonable to conclude that a tender offer price of $9.00 per share together with estimated fees and expenses of $.50 per share . . . would be required to

effectuate a successful tender offer for the purchase of 550,000 shares."

On April 9, 1976 Medicorp's Notice of Annual Meeting and attached Proxy Statement were mailed to its shareholders. The Proxy Statement described the terms of the agreements and in an appendix the agreements themselves were set forth. On May 20 the annual meeting was held and the agreements with Goldsamt were approved by a vote of 81 per cent of the shares voting on the proposal. The agreements were consummated on May 21, 1976 whereupon Goldsamt resigned from Medicorp's Board of Directors.

At trial the defendant directors Miller, Kemper, Leiman and Cronkhite, as well as Goldsamt, all testified and gave their views and reasons as to the value of Medicorp stock at the time, and all were in agreement for one reason or another that the stock had a true value far greater than its market price and, at the very least, an intrinsic value equal to the price paid to Goldsamt. With this factual background, I turn to the specific contentions made by the plaintiff.

### II.

Plaintiff takes the position that the determination of the price to be paid to Goldsamt for his shares was not based upon any independent opinion as to value. He says that on the contrary, the defendant Board simply paid Goldsamt his asking price because he refused to accept anything less. He suggests that the noncompetition and consultation agreement was something concocted by the Board to make the deal look better, but that actually Goldsamt was paid $10.00 per share because that was his price for removal as a director and influential shareholder. Plaintiff further suggests that the real motivation for this decision was the Board's desire to insure its continuing control of Medicorp rather than to serve the best interests of the corporation and its stockholders. He says that because of these realities of the situation, the proxy statement sent to the shareholders was materially false and misleading in several ways.

To begin with, plaintiff contends that the proxy statement was defective in that it failed to specifically disclose that at the time the corporation was proposing to purchase 550,000 shares from Goldsamt at the stated price of $9.50 per share it was also actively engaged in a program of buying shares on the market from its "little" shareholders at a much lower price. In particular, plaintiff asserts that it was misleading to fail to disclose that on February 5, 1976, the day the Board approved the agreements with Goldsamt, the corporation had purchased 6,000 shares on the market at quotations ranging from $6\frac{7}{8}$ to 7. He likewise feels it improper not to have disclosed that during the week preceding February 5, 1976 the corporation had purchased 64,200 shares on the market at quotations ranging $6\frac{5}{8}$ to $7\frac{1}{4}$. He suggests that such disclosure was required because of the fact that the Board had inside information available to it indicating that the stock was worth more than its trading price, and, relying on *Brophy v. Cities Service Co.*, 31 Del.Ch. 241, 70 A.2d 5 (1949); *S.E.C. v. Texas Gulf Sulphur*, 401 F.2d 833 (2d Cir. 1968); and *Gould v. American Hawaiian Steamship Co.*, 351 F.Supp. 853 (D.Del.1972), he contends that it is improper to engage in a purchase of stock based on inside information, the result of which is to treat public shareholders differently than insider shareholders.

This, however, is not persuasive. In the authorities cited the undisclosed information was utilized by insiders to acquire stock for their individual accounts or to obtain a personal gain. That was not the situation here since it was the corporation buying its own stock from an insider based on information which to the Board made it beneficial to the corporation to do so. Moreover, the proxy statement did disclose that between January 1, 1975 and March 30, 1976 Medicorp had purchased on the open market 268,760 shares of its own common stock for an aggregate price of $1,809,163 at per share prices ranging from $1.75 to $8.88. It also contained a list of Medicorp's quarterly high-low prices on the New York Stock Exchange from the first quarter of 1975

through April 30, 1976. It further advised that the directors had authorized another $1,000,000 to be set aside for additional purchases of Medicorp stock. It would seem that any discerning reader could perceive from this that Medicorp was proposing to pay Goldsamt more than the market price and more than it had previously paid for the stock of other shareholders.

Secondly, plaintiff says that the proxy statement artfully misrepresented the roles of Loeb, Rhoades and Bache in arriving at the contract price. He relies on the following language of the proxy statement (with his emphasis supplied):

"The Company asked Loeb, Rhoades & Co., . . . *to express its judgment* . . . as to the cost of conducting a tender offer for the purchase of 550,000 shares. On February 3, 1976, . . Loeb Rhoades & Co. advised the Company that *in its judgment,* it would cost the Company approximately $9.50 per share, or an aggregate of $5,250,000, to conduct a successful public tender offer for the purchase of 550,000 shares of its Common Stock . . . *This judgment* was confirmed by Loeb, Rhoades & Co. on and as of February 5, 1976, when the Board of Directors considered the proposed transactions with Mr. Goldsamt.

\* \* \* \* \* \*

"The Board of Directors determined that it was advisable to obtain *an additional opinion* from a second investment banking firm with respect to the cost to the Company of conducting a successful public tender offer for the purchase of 550,000 of its shares. Consequently, the Company requested Bache Halsey Stuart Inc. ('Bache') for *its opinion* in this regard. Bache has advised the Company that, based solely on the market prices at the time *Loeb Rhoades & Co. expressed its judgment* and on *Bache's appraisal* of the market activity of the Company's Common Stock, it is reasonable to conclude that a tender offer price of $9.00 per share, together with estimated fees and expenses of $.50 per share as set forth above, would be required to effec-

tuate a successful public tender offer for the purchase of 550,000 shares. *This opinion* was *confirmed* by Bache on and as of April 7, 1976."

He suggests that the natural inference from this is that the Board arrived at the $9.50 figure based on the independent "judgment" of Loeb, Rhoades and the additional "opinion" of Bache as to the price that would be necessary on February 5, 1976 to acquire 550,000 Medicorp shares through a tender offer, an inference which was false since the Board had already decided to meet the price demanded by Goldsamt regardless of the opinions of the investment banking firms. He points out that although the proxy statement indicates that Bache "confirmed" its opinion on April 7, 1976, it actually did not give its written opinion until that date, which was a time more than two months after the agreements were approved by the Board and some two weeks after the proxy materials were first sent to the Securities and Exchange Commission. He further notes that no documentation or spread sheets from Loeb, Rhoades were produced and suggests that the total of Loeb, Rhoades input was an oral opinion given by defendant Kemper, as a member of Loeb, Rhoades, off the "top of his head." He relies on the recent decision of *Royal Industries, Inc. v. Monogram Industries, Inc.,* 1976–77 CCH Fed.Sec.L. Rep. ¶ 95,863 (C.D.Ca.1976) as being on all fours in condemning a similar misrepresentation of an investment house evaluation.

Again, however, I feel that in his zeal to establish fraud, plaintiff has elected to read only what suits his purpose. And, if the Court is asked to brand language misleading then as a starting point a plaintiff must be charged with accepting that which it actually says. In this light, a portion of the proxy statement not mentioned by plaintiff discloses the following:

"In reaching its decision concerning the *price proposed to be paid* by the Company to Mr. Goldsamt for the shares, the Board of Directors concluded that it would be desirable *to compare this proposed price with an estimate of the cost to the Com-*

*pany of conducting a successful public tender offer for the purchase of 550,000 shares of its Common Stock, . . .."* (Emphasis added.)

The import of this is that before reaching its final decision on the $9.50 price it proposed to pay Goldsamt, the Board deemed it advisable to "compare this proposed price" with an estimate of the cost of conducting a public tender offer for the same amount of shares. In other words, the proxy statement concedes that the Board first determined to pay Goldsamt $9.50 before comparing this figure with tender offer estimates from either Loeb, Rhoades or Bache. Thus, fairly read, it does not represent that the price was reached only as a result of the Bache and Loeb, Rhoades estimates as to a tender offer figure. Since the proxy statement says the contrary to what plaintiff would infer, I cannot conclude it to be misleading in this respect.

In *Royal Industries, Inc. v. Monogram Industries, Inc.* a press release to shareholders indicated that Royal's Board of Directors was "guided" in its decision to oppose Monogram's tender offer by an "evaluation prepared by Dean Witter & Co., Inc., regarding the adequacy of the offer." This was held to be misleading because the evaluation had been prepared "virtually overnight" and without the necessary time and deliberation for a fair evaluation of Monogram's proposed cash offer. More importantly, however, it was factually determined that Royal's Board was not guided by the evaluation, but rather by the defensive and self-serving reactions of the directors and management. Here the challenged message to shareholders was not sent out immediately following an "overnight" evaluation by Loeb, Rhoades. It went to shareholders some two months later. Moreover, as noted previously, the proxy statement here does not indicate that the Board was "guided" by Loeb, Rhoades in reaching its decision in the sense that the judgment of Loeb, Rhoades was the determining factor. Thus, the situations are distinguishable.

Plaintiff also charges that the reasons given in support of the Board's decision to purchase Goldsamt's shares were false and without foundation. In the words of the proxy statement:

"A further consideration in the Board's determination to purchase the Shares was the continuing differences between Mr. Goldsamt and officers and other directors of the Company over the management policies of the Company. These differences have absorbed valuable time and effort of the Board and management of the company. Accordingly, the Board believes it to be in the best interest of the Company to remove this dissidence and thereby eliminate possible disruption of the Company's activities, unnecessary expense, and damage to its employee relations."

Plaintiff says that the reference to damage to employee relations was misleading since there was no proof that any person had either left Medicorp because of Goldsamt or refused to come with the corporation because of him. He further relies on the failure of the Board to establish any expense caused the corporation by Goldsamt, unnecessary or otherwise. Finally, he points out that the defendants did not show disruption of any business program approved by the majority of the Board. No projects were abandoned because of Goldsamt and, by his own admission, he was not interested in the day-to-day business of the enterprise. Consequently, argues plaintiff, since Goldsamt had not been responsible for any damage to employee relations since he had caused no unnecessary expense and since he had caused no disruption of corporate business, it was false to state that the decision to purchase his shares was made so as to avoid these things in the future.

I find this argument also to be unpersuasive. The evidence clearly indicated a long-festering disagreement between Goldsamt and the other directors as to the business direction Medicorp should take. He was against growth and expansion under the existing circumstances while the others were for it. He was unwilling to accept

their majority view. He was outspoken, in his objections and scornful of their decisions. Because of his protestations, approval of the Louisville project was delayed several months. Because of his boardroom and related actions, the site of the directors' meetings was changed to another city for the protection of employee morale. As a stockholder of some magnitude, he represented a force with which to be reckoned so long as he maintained his dissident views. In short, his potential for disruption was there and his past conduct had indicated that he was quite capable of putting it into effect. From the evidence I am convinced that it was because of the immediate past conduct of Goldsamt together with his sometimes-abrasive personality and his outspoken minority views as to Medicorp's business goals that prompted the Board to act quickly in accepting his offer to sell his stock and resign as a director. Viewed in light of the existing facts, I cannot find the reasons listed by the Board in the proxy statement to be misleading. Plaintiff's view seems to be that you must permit at least one horse to escape the corral before the expense of fixing the fence to retain the others can be justified.

Finally, plaintiff charges that the proxy statement was misleading in that it failed to disclose that the Board's decision was also prompted by the fact that Goldsamt had "threatened" a proxy fight at both the September 1975 and January 28, 1976 Board meetings. I see no merit in this argument either. By and large the Board members did not take Goldsamt's September 1975 expression seriously—or so they say. It is true that as a precautionary measure proxy solicitation and proxy litigation firms were retained, but this was done by Miller without the prior knowledge of the majority of the Board. The Board's initial suspicions were confirmed when Goldsamt took no action during the next four months. At the January 1976 meeting he again made rumblings about the possibility of a proxy fight. However, his sudden decision at the end of the meeting to sell his stock was not put forth in a manner to indicate that it was his price for foregoing a proxy fight. From the testimony offered by some of those present, including Goldsamt, as well as from the minutes of the meeting, I cannot conclude that in agreeing to buy his shares the Board yielded to any real threat of a proxy fight by Goldsamt.

While the potential for a proxy fight exists in any dissident shareholder having considerable stock ownership, this differs from an immediate threat to do battle. I am not convinced from the evidence that a desire to avoid an impending proxy fight—as opposed to a desire, among other things, to eliminate the potential expense and disruption of a proxy fight in the future—was a critical factor in the Board's decision. Consequently, I cannot conclude that it was a material omission to fail to mention it in the proxy statement.

 To summarize this point, while a corporation must adequately inform shareholders as to matters under consideration, the requirement of full disclosure does not mean that a proxy statement must satisfy unreasonable or absolute standards. Many people may disagree as to what should or should not be in such a statement to shareholders, and as to alleged omissions the simple test (sometimes difficult of application) is whether the omitted fact is material. *Kaufman v. Shoenberg,* 33 Del.Ch. 211, 91 A.2d 786 (1952). There is obviously no requirement to include insignificant information. Compare *Baron v. Pressed Metals of America,* Del.Supr., 35 Del.Ch. 581, 123 A.2d 848 (1956); *American Hardware Corporation v. Savage Arms Corporation,* 37 Del.Ch. 10, 135 A.2d 725 (1957). Provided that the proxy statement viewed in its entirety sufficiently discloses the matter to be voted upon, the omission or inclusion of a particular item is within the area of management judgment. *Schiff v. RKO Pictures Corp.,* 34 Del.Ch. 329, 104 A.2d 267 (1954).

This long standing view of the Delaware courts comports with the recent expression of the United States Supreme Court in *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)

wherein it was stated that in order for an omission to be material,

" . . . there must be a substantial likelihood that the disclosure of the fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."

Id., 96 S.Ct. at 2133.

Measured against this standard, I view plaintiff's several accusations that the proxy statement was materially false and misleading to be unfounded.

### III.

Plaintiff's second point of contention is that even if the proxy statement is not held to have been misleading, the price paid to Goldsamt was far too high and for this reason the corporation is entitled to relief against the individual defendants for having wasted corporate assets. Plaintiff's approach to this is threefold. Through his financial analyst, Carl Goldman, he has offered expert testimony to show, in the opinion of Goldman, first that 550,000 shares of Medicorp stock could have been acquired through a public tender offer at a cost no greater than $8.25 per share; second, that the intrinsic value of Medicorp stock on February 5, 1976 was approximately $7.25 per share; and, third, that through purchases on the market over a period of six to nine months, and while adhering to Securities and Exchange Commission regulations, the corporation could have acquired 550,000 shares of its common stock at an average price of $8.25 per share, even allowing for the gradual increase in price that such a purchase program by the corporation might have occasioned.

In arriving at his tender offer figure, Goldman compared and analyzed tender offers of comparable size and stock price ranges made by other companies over a period extending from April 1974 through mid-1976. He calculated the average premium paid in these comparable tender offers to be 23 per cent. Because 550,000 shares of Medicorp would have then represented only 6 per cent of its stock float, and

because he felt that the lower the percentage of the float sought the lower the premium required to get it, Goldman deemed it appropriate to reduce the 23 per cent average to 15 per cent in the case of Medicorp. Applying this 15 per cent premium to Medicorp's closing price of $6.75 on February 5, 1976 and adding to the product the estimated per share figure of $.50 for expenses involved in making a tender offer, Goldman reasoned that an offered price of $8.25 would have easily attracted 550,000 shares from the public investors. Plaintiff suggests that this conclusion is supported by an inter-office memo of Georgeson & Co., the proxy solicitation firm retained by Medicorp, which expressed the view of an officer or member of that firm that at the price being paid Goldsamt a public tender offer would have produced far more shares than the corporation was acquiring from Goldsamt.

As to the intrinsic value analysis, plaintiff relies upon *Gibbons v. Schenley Industries, Inc.,* Del.Ch., 339 A.2d 460 (1975) and *In re Olivetti Underwood Corporation,* Del. Ch., 246 A.2d 800 (1968) for the proposition that market price should be given at least a 50 per cent weight factor. Starting from this Goldman then discounted Medicorp's net asset book value from $16.79 to $5.88 by eliminating an included goodwill figure of $10.91. He did so based on the knowledge that both the federal government and the State of California (were 25 per cent of Medicorp's beds are located) were challenging the amount of goodwill claimed by Medicorp for the purpose of receiving payment under medicare and medicaid programs. Goldman further concluded that Medicorp's price/earning ratio should be 5.9x7 based on a 25 per cent discount from the industry average. This price/earnings multiple of 5.9 he applied against earnings of $1.24 realized for a trailing twelve-month period. From all this he concluded that the intrinsic value of Medicorp stock on February 5, 1976 was not more than $7.25 per share.

The open market purchase figure was derived by an examination of the actual trading price for Medicorp stock over the

six-to-nine-month period subsequent to February 5, 1976 considered in light of the restrictions imposed on a corporation dealing in its own stock by proposed Securities and Exchange Commission Rule 240.13(e)–(2).

Accepting $9.50 as the per share price paid Goldsamt, the difference between that amount and plaintiff's intrinsic value figure of $7.25 would indicate an overpayment to Goldsamt in the sum of $1,237,500 for his 550,000 shares. Using the $8.25 tender offer and market purchase figure urged by plaintiff, the waste to the corporation under his theory would amount to $687,500. Plaintiff argues that in the event that the transaction between Medicorp and Goldsamt is not rescinded, then the corporation is entitled to damages against the individual defendants in one or the other of these amounts.

In opposition to the foregoing, defendants offered the testimony of their own expert, Frederick Frank, a partner in the New York investment banking firm of Lehman Brothers. Frank's qualifications disclosed an almost isolated association with the health care industry during its various stages of development, with particular reference during latter years to the proprietary hospital field. Needless to say, his opinions were in sharp contrast to those of Mr. Goldman.

As to intrinsic value, Frank considered it unrealistic to entirely discount the goodwill element so as to ascribe to Medicorp a net asset book value of $5.88 per share. In the area of price earnings evaluation, Frank chose to work with "normalized earnings" and, relying upon elements particular to the proprietary hospital industry, he concluded that based on factors existing in early 1976 it would have been appropriate to anticipate annual earnings for Medicorp of between $1.49 and $1.66 per share. (Medicorp's Board chose to base its future plans on anticipated earnings for 1976 of $1.61 per share, a figure which proved to be low in view of actual 1976 earnings of $1.71 per share.) Frank questioned Goldman's basis for arriving at his price/earnings multiple

since Goldman included companies not strictly in the proprietary hospital business in deriving his average industry multiple. Using the multiple of the composite price/earnings ratio of the three leading companies which were in the same business as Medicorp (which companies were also utilized by Goldman in his comparisons), and discounting it 10 per cent because of a comparison of Medicorp to them, Frank concluded that a proper price/earnings multiple for Medicorp would have been 8.8x7 which, applied against his earnings estimates of $1.49 to $1.66, would have indicated value of $13.11 to $14.61 per share in February 1976 as opposed to Goldman's calculation of $7.25. Even using Goldman's approach with some adjustments he was able to reach figures in the area of $9.50 to $10.00 per share.

Without further belaboring detail, Frank was also of the opinion that Loeb, Rhoades' estimated tender offer price was reasonable under the circumstances, as was the Board's assumption that on February 5, 1976, 550,000 shares could not have been purchased on the market within a reasonable time at ascertainable prices.

No doubt the foregoing appears complicated, particularly to those not trained in the area of financial and market analysis. At the same time it illustrates that all such opinions depend upon the subjective approach taken by those rendering them. This, of course, highlights the issue here. The question for determination is not whether the stock actually could have been acquired less expensively on the market or through a tender offer. The issue is whether on February 5, 1976 the individual defendants exercised honest and reasonable judgment in agreeing upon the $9.50 per share figure in view of all the circumstances.

■ Defendants, relying on *Schiff v. RKO Pictures Corp., supra,* take the position that in view of the approval of the transaction by the shareholders of Medicorp, the burden is on the plaintiff to demonstrate improper conduct on their part. At the same time it has been held that a

waste of corporate assets cannot be ratified by stockholders, except by unanimous vote. *Kerbs v. California Eastern Airways, Inc.*, Del.Supr., 33 Del.Ch. 69, 90 A.2d 652 (1952); *Saxe v. Brady*, 40 Del.Ch. 474, 184 A.2d 602 (1962). As summarized at *Folk, The Delaware General Corporation Law*, § 144 at 84–85 (1972):

> " . . . the validating effect of [stockholder] ratification would be overturned only by the objectors' demonstrating that the transaction amounted to waste, which, as previously indicated, could not be effectively ratified. But if in fact waste of assets is alleged, the court will examine a transaction, notwithstanding independent stockholder ratification, but it will limit its scrutiny to determining whether the consideration is so inadequate that no person of sound, ordinary business judgment would deem it worth what the corporation paid; on this test the court will uphold the transaction if ordinary businessmen might differ on the sufficiency of its terms."

See also *Gottlieb v. Heyden Chemical Corp.*, 33 Del.Supr. 82, 90 A.2d 660 (1952); *Saxe v. Brady, supra.* Applying this test, the transaction here must be upheld.

■ In the area of valuation, wide discretion is allowed to directors, and as long as they appear to act in good faith, with honest motives, and for honest ends, the exercise of their discretion will not be interfered with by the courts. *Muschel v. Western Union Corp.*, Del.Ch., 310 A.2d 904 (1973); *Cole v. National Cash Credit Ass'n.*, 18 Del.Ch. 47, 156 A. 183 (1931). The presumption of sound business judgment reposed in a Board of Directors will not be disturbed if any rational business purpose can be attributed to its decision. *Sinclair Oil Corporation v. Levien*, Del.Supr., 280 A.2d 717 (1971); *accord, Gimbel v. Signal Companies, Inc.*, Del.Ch., 316 A.2d 599, *aff'd*, Del.Supr., 316 A.2d 619 (1974).

By statute a director is fully protected in relying in good faith on reports to the corporation made by an appraiser selected with reasonable care. 8 *Del.C.* § 141(e). While it was admittedly predisposed to do so, the Board here did not enter into the agreement with Goldsamt until it first obtained a comparison from Loeb, Rhoades as to the likely cost of a tender offer. Before it finally submitted the matter to the shareholders it obtained a similar opinion from Bache. Loeb, Rhoades had previously acted as the investment banking advisor for Medicorp, so it can hardly be assumed that it was selected as an advisor on this proposal in the absence of reasonable care. There is no challenge as to the qualifications of Bache. Plaintiff is primarily troubled by the lack of formality or detail with which these opinions were rendered. Yet the proxy statement was allowed to state that the $9.50 figure was an estimated tender offer price approved by each firm, a factor which would seem to indicate that each firm was content to stand behind its estimate regardless of how it was delivered. To the extent that the Board relied upon these reports in confirming its decision to go through with the Goldsamt transaction, I fail to see how the individual members can be held accountable for improper conduct.

Furthermore, in making his arguments as to the waste of assets, plaintiff seems to take financial matters out of context and attempts to limit the issue to one of value alone. In so doing, he ignores the other considerations which motivated the Board as discussed previously herein. He ignores also the fact that the Board did not pay Goldsamt his precise asking price of $10.00 per share, but rather that it exacted from him an agreement not to compete with the corporation he founded and to be available for consultation purpose for a period of five years. The fact that the noncompetition and consultation agreement had a separate value to Medicorp is not seriously disputed and there is no proof that the total consideration of $275,000 attributed to it is unreasonable or excessive. Moreover, Goldsamt has since provided services to the corporation pursuant to this agreement which have been of financial benefit to its interests.

■ While plaintiff would have the cases distinguished for factual reasons, I am of the opinion that the decision here is controlled by the principle set forth in *Cheff v. Mathes*, Del.Supr., 41 Del.Ch. 494, 199 A.2d 548 (1964) and *Kors v. Carey*, 39 Del.Ch. 47,

158 A.2d 136 (1960). These cases stand for the proposition that the use of corporate funds to acquire the shares of a dissident stockholder faction is a proper exercise of business judgment where it is done to eliminate what appears to be a clear threat to the future business or the existing, successful business policy of a company and is not accomplished for the sole or primary purpose of perpetuating the control of management. In so doing, the fact that a price paid is in excess of market does not necessarily make the transaction improper. See also, *Folk, The Delaware General Corporation Law,* § 160, at 156–157. As recognized in *Cheff v. Mathes, supra,* at 199 A.2d 555:

" . . . a substantial block of stock will normally sell at a higher price than that prevailing on the open market, the increment being attributable to a 'control premium.' Plaintiffs argue that it is inappropriate to require the defendant corporation to pay a control premium, since control is meaningless to an acquisition by a corporation of its own shares. However, it is elementary that a holder of a substantial number of shares would expect to receive the control premium as part of his selling price, and if the corporation desired to obtain the stock, it is unreasonable to expect that the corporation could avoid paying what any other purchaser would be required to pay for the stock."

In this case the price paid to Goldsamt is not even defended on the control premium theory. Rather it is based on the belief by both Goldsamt and the Board, supported by at least some evidence, that the stock was not overpriced at $9.50 per share despite existing market quotations. It was a determination made by a Board of Directors which felt that based on information then available it would have been of questionable propriety to make a tender for the same amount of shares at a price of $9.00 per share to Medicorp's public shareholders. The decision was made and consummated only after the Board investigated the possibility of legal obstacles and sought confirmation through comparative tender offer estimates. Although the Board deemed it unnecessary, it was persuaded by the New York Exchange (or compelled to do so as plaintiff would have it) to submit the matter to the vote of the stockholders. The result was stockholder approval. And finally, it was done for the announced purpose of removing Goldsamt as a threat to the future business of the corporation, a purpose for which there existed at least some factual basis.

In final analysis, I am satisfied that the defendant members of the Board of Directors acted in good faith and based upon reasonable investigation and advice under the circumstances. Viewed overall, I do not find that the price paid to Goldsamt for his 550,000 shares and the five-year noncompetition and consultation agreement to have been a waste of corporate assets.

Accordingly, for the reasons herein given, I conclude that the allegations of the amended complaint have not been established. Judgment will be entered in favor of the defendants. Order on notice.