Ruth PANTER et al., Richard Weiss, Alan Markovitz, Paul Kriendler, David H. Greenstein, Ronald Egnor, William Saltiel et al., Michael DeBartolo, Joseph Berke, Plaintiffs,

v.

MARSHALL FIELD & COMPANY et al., Defendants.

Nos. 78 C 537, 78 C 620, 78 C 1179, 78 C 1141, 78 C 1700, 78 C 2556, 78 C 2067, 78 C 2373 and 78 C 2480.

United States District Court, N. D. Illinois, E. D.

March 3, 1980.

Robert S. Atkins, Freeman, Atkins & Coleman, Ltd., Alan L. Unikel, Rosenberg,

Savner & Unikel, Chicago, Ill., Donald H. Weinberg, Kohn, Savett, Marion & Graf, Philadelphia, Pa., Arthur T. Susman, Richard Prins, Robert D. Allison, Prins, Flamm & Susman, Ltd., Harry A. Young, Jr., Bilandic, Neistein, Richman, Hauslinger & Young, Ltd., Lawrence H. Eiger, Much, Shelist, Freed, Denenberg, Amend & Eiger, P. C., Chicago, Ill., George P. Birnbaum, Ira B. Rose, Phillips, Nizer, Benjamin, Krim & Ballon, Stuart D. Wechsler, Robert Harwood, Edward Labaton, Kass, Goodkind, Wechsler & Labaton, New York City, Sherrie R. Savett, Berger & Montague, P. C., Steven Kapustin, Mitchell Kramer, Kramer & Salus, Philadelphia, Pa., Hugh J. Schwartzberg, Schwartzberg, Barnett & Cohen, Max Sherman, Dvorkin & Sherman, Chicago, Ill., for plaintiffs.

Bryson Burnham, Tyrone Fahner, Charles W. Mulaney, Jr., Kelly R. Welsh, Mayer, Brown & Platt, Hammond E. Chaffetz, Joseph DuCoeur, Donald G. Kempf, Jr., Kirkland & Ellis, Michael W. Coffield, Daniel J. Pope, Charles W. Deuser, II, Coffield, Ungaretti, Harris & Slavin, Lowell E. Sachnoff, Marvin A. Tenenbaum, Sachnoff, Schrager, Jones, Weaver & Rubenstein, Chicago, Ill., for defendants.

## MEMORANDUM

LEIGHTON, District Judge.

This is a consolidated jury trial of four out of nine related class suits in which the complaints allege violations of Sections 10b, 14d, and 14e of the 1934 Securities and Exchange Act. Twenty-one plaintiffs, on their behalf and representing four subclasses of 16,662 shareholders who own 9,054,065 shares of common stock of Marshall Field & Company, a Chicago based department store, sue for preliminary and permanent injunction, damages, and other relief. The suits are brought under federal securities laws and rules and regulations of the Securities and Exchange Commission. Plaintiffs invoke the jurisdiction of this court pursuant to 15 U.S.C. § 78aa; and they allege pendent claims based on doctrines of the common law.

In the earliest suit filed in this court, 78 C 537, plaintiffs and class representatives are Alice D. Sinsheimer,[1] Sam Brown, Arnold Kamerling, Julius Green, George A. Levitt, Jack Stacey, Jr., Estelle A. Stacey, Anita H. Johnson, Donald E. Tracy, Barber J. Tracy, Irving J. Hillman and Stanley Bernstein; in the next, 78 C 620, Richard Weiss; in the next, 78 C 1141, Paul Kriendler of New Jersey;[2] in the next, 79 C 1179, Allen J. Markovitz of Pennsylvania; in the next, 78 C 1700, David H. Greenstein; in the next, 78 C 2067, William Saltiel and Clarice Saltiel; in the next, 78 C 2373, Michael DeBartolo of New York; in the next 78 C 2480, Joseph Berke; and in the last filed of these cases, 78 C 2556, Ronald Egnor of New York. Plaintiffs, in varying amounts, are owners of the common stock of Marshall Field & Company, a Delaware corporation with its principal offices in Chicago, Illinois.

The defendants are Marshall Field & Company,[3] Angelo R. Arena, George C. Rinder, and Arthur E. Osborne, president and chief executive officer, executive vice president, and senior vice president, respectively, of Marshall Field; Jean Allard, Edward McCormick Blair, John M. Budd, Albert B. Dick, III, Howard M. Packard, John M. Simpson and Harold Byron Smith, Jr., directors of the company.[4] Each defendant, also in varying amounts, is a Marshall Field shareholder.

In a stipulation of the parties approved by this court in a pretrial order, it has been

---

1.  Ruth Panter, the original plaintiff in 78 C 537, was dismissed from the suit during the pretrial phase of the case.

2.  Where the citizenship of a plaintiff is not stated, it is because he or she is a citizen of Illinois.

3.  Marshall Field & Company is only a nominal party. Plaintiffs have stated that they seek no

judgment or relief against it since they are its shareholders, and thus owners of the corporation.

4.  The death of John M. Budd, prior to this trial, has been suggested; but no attempt has been made by plaintiff to substitute his legal representative as a defendant in these proceedings. *See* Rule 25(a), Fed.R.Civ.P.

agreed that trial on the pleadings in *Weiss*, 78 C 620, *Egnor*, 78 C 2556, and *Berke*, 78 C 2480, will be binding on all parties in these consolidated cases with the exception of the plaintiffs in *Panter*, 78 C 537.

In each of these consolidated class suits, after the jurisdictional, venue, and general class allegations, plaintiffs complain[5] that in early October, 1977, a California corporation named Carter Hawley Hale, through certain members of its board of directors, approached Marshall Field & Company and expressed an interest in the two companies beginning to negotiate a merger; that this interest continued from that time through and including February 21, 1978; that on December 12, 1977, Carter Hawley Hale delivered a letter to Field proposing that it consider a transaction whereby Carter Hawley Hale would exchange a quantity of its common stock for outstanding stock of Field; that included in the proposal was the understanding that Field shareholders would have the option of receiving cash up to 49% of the total transaction; that on the same day, Carter Hawley Hale issued a press release announcing this communication that was transmitted by it to Field; that from time to time prior to that date, substantial, listed companies, other than Carter Hawley Hale, also approached Field proposing a merger or other form of permanent relationship between Field and those companies; that in February, 1978, Carter Hawley Hale announced that a specific tender offer would be made for Field's common stock under the terms of which Carter Hawley Hale would acquire outstanding common stock of Field for cash and stock amounting to approximately $42.00 per share; that Section 14(e) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78n(e), provides in its pertinent part that:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the state-

ments made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

It is further alleged that, in spite of the prohibitions contained in Section 14(e), defendants, the directors of Marshall Field, conspired to and did embark on a course of conduct designed to deceive plaintiff[s] and other class members in order to induce plaintiff[s] and other class members to oppose the tender offer. It is also alleged that defendants conspired and embarked upon a course of manipulative acts and practices designed substantially to inhibit plaintiff[s] and other class members from accepting the tender offer. Plaintiffs allege a course of conduct, followed by defendants, aimed at defeating the tender offer of Carter Hawley Hale, and misleading and deceiving Field's shareholders and the public with regard to the company's plans for corporate expansion. In other counts of the complaints, it is alleged that the same course of conduct unlawfully violates Section 10(b) of the Securities and Exchange Act of 1934, and Rule 10(b)–5 promulgated thereunder by the Securities and Exchange Commission; and further, that the acts of the defendants about which plaintiffs complain, and which they allege are unlawful, were breaches of fiduciary obligations which defendants, as Marshall Field directors, owed to the stockholders of the company, including plaintiffs and other members of the class. Plaintiffs pray for injunctive relief, damages which one plaintiff claims exceed $200 million, the award of attorneys' fees and costs, and such other relief as the court may deem just and proper.

5. This summary of the conduct about which the complaint is made, and of the unlawful course of conduct alleged, is taken from the first amended complaint in *Panter*, 78 C 537 and the amended complaint for injunction and

other relief in *Weiss*, 78 C 620 because, when examined, it can be seen that the allegations in the other complaints are either identical or substantially similar to those in these two cases.

Defendants have answered each complaint, and they deny all allegations which charge that they, in any way, have violated any of the provisions of the Securities and Exchange Act of 1934, Section 10b or 14(e), or any fiduciary duty owed to the stockholders of Marshall Field & Company. They admit, however, that on or about December 12, 1977, Carter Hawley Hale delivered a letter to Field, but state that the letter speaks for itself; that in connection with the letter, defendants caused to be published a communication in the Chicago Tribune that incorporated a letter to Field employees; that they mailed a letter to Field's shareholders; that they filed a lawsuit in the United States District Court for the Northern District of Illinois against Carter Hawley Hale; that thereafter they agreed to acquire five former Liberty House Stores in Washington and Oregon, and announced plans to open and operate a store in Houston, Texas; and that Field is considering the establishment of other stores in other areas of the country including Northbrook, Illinois, and the southwest United States. They further admit that Field has discussed with others the possible acquisition of other stores.

In addition, defendants have pled affirmative defenses, including their allegation that plaintiffs' complaints fail to state a claim on which relief can be granted by this court; that the complaints fail to satisfy the requirements of Rule 23, Federal Rules of Civil Procedure, precluding plaintiffs from proceeding in these class suits; that the complaints fail to satisfy the requirements of Rule 23.1 of the Federal Rules of Civil Procedure, and thus plaintiffs cannot proceed with a derivative suit; and that the complaints are barred in whole or in part by the applicable statutes of limitations. Defendants request the court to dismiss plaintiffs' complaints, award them costs and

fees, and grant them such other and further relief as may be appropriate.

After four weeks in which the jury has heard evidence consisting of testimony of thirteen witnesses, excerpts from four depositions, a vast number of exhibits, and several stipulations, plaintiffs have rested their case in chief; defendants now move for dismissal pursuant to Rule 41(b), or in the alternative, for directed verdicts pursuant to Rule 50(a), Federal Rules of Civil Procedure. These motions require the court to view the evidence in the light most favorable to the plaintiffs;[6] and all reasonable inferences which can be drawn from the evidence must be in their favor.[7] Accordingly, the court determines that the following are the facts most favorable to the plaintiff which the jury in this case could find from the testimony, the deposition excerpts, the stipulations, and the exhibits in the record.

### I.

Marshall Field & Company[8] is a full line, high quality department store which has sold general merchandise, apparel, and furniture in Chicago and other large cities of the country. It was founded in 1852 by the Chicago merchant, Marshall Field, and the company expanded gradually over the next century. By the end of 1976, it was the eighth largest department store chain in the United States, with 31 stores, 15 of them in the Chicago area and others in Cleveland, Ohio, and in Seattle and Spokane, Washington. The company is today a publicly owned corporation, with more than 16,000 shareholders having purchased in excess of 9,000,000 shares of its common stock sold on the New York and Midwest Stock Exchanges. Its board of directors at the end of 1976 consisted of twelve persons with extensive industrial, financial, business and

---

**6.** *Duriso v. K–Mart No. 4195, Div. of S. S. Kresge Co.*, 559 F.2d 1274, 1277 (5th Cir. 1977); *Lescher Building Service, Inc. V. Local Union No. 133, etc.*, 310 F.2d 331 (7th Cir. 1962).

**7.** *Gehrhardt v. General Motors Corp.*, 581 F.2d 7 (2d Cir. 1978); *Hackett v. Reynolds and Co.*, 577 F.2d 948 (5th Cir. 1978).

**8.** Hereafter in this Memorandum, Marshall Field & Company will be referred to as Marshall Field, Field, or company, as the context may require.

professional backgrounds; five of them were executives of the company. It had five corporate and subsidiary divisions and employed thousands of persons in various capacities, but no member of the Field family either occupied a management position or was a director of the company. For the year 1976, Marshall Field reported to its shareholders that it had made sales totaling $609.9 million.

Despite this growth, Field's expansion did not match that of other department store chains. It was an attractive combination of stores and was highly regarded for the quality of its name, one which industry leaders thought could be taken anywhere in the country. But because of its accumulated worth, the strength of its balance sheet, its large cash reserves, and its borrowing potential, leaders of the department store business considered Field vulnerable to a takeover by another company. In fact, investing shareholders studied Field's earning reports, researched its performance "and determined that [Field in mid-1976] was a good company for a takeover." [9] This evaluation had become known to Field, its management and directors as early as the late 1960s.

In 1967, one of the companies that expressed an interest in a merger with Field was Carter Hawley Hale,[10] a nationwide, multi-division chain of department stores with corporate offices in Los Angeles, California. Nothing came of this expression because the directors of Field decided that the company's future lay in remaining an independent corporation. Carter's interest, however, was significant. It had operated traditional department stores since 1946. It was a large company with locations in several cities and operations covering northern California and the southwestern United States. Carter constantly analyzed potential markets throughout this country and Canada; it acquired several stores each year from the origin of its business. By

1977 it had increased its operations to 71 traditional stores, 30 specialty stores, and 433 book stores. It continued to expand by acquisitions throughout the time the controversy in these suits arose.

Being an attractive company, one vulnerable to a takeover, presents many problems to the management, the directors, and the shareholders of a publicly owned American corporation. A takeover can be either friendly or unfriendly. It is friendly when solicited or welcomed by the target company. It is unfriendly when the target company is the object of acquisition by a raider who, complying with state and federal securities laws, makes the required disclosures and proposes an exchange or tender offer for the number of outstanding common shares of the company that will result in control of the target. A takeover, when unfriendly, has a disruptive effect on the management of a target company and its board of directors. It may be welcomed by some, but not all of the target company's shareholders. A takeover can be expensive; it often raises questions of possible violations of the antitrust laws; and it presents problems under the securities statutes and the rules and regulations adopted thereunder. Consequently, a company vulnerable to a takeover must have guidance from lawyers, investment bankers, accountants, and business consultants.

For a long period of time prior to December 10, 1977, Marshall Field was such a company. In each instance when approaches were made to its directors by anyone interested in acquiring it, or by another corporation that desired a merger, the directors considered the matter but concluded in each case that they did not want the company's uniqueness among its customers diluted by affiliation or merger with another retailer. Pressed, however, by the problem of the company's continued vulnerability to a takeover, Field's directors sought the advice of legal counsel. They consulted

---

**9.** This was the testimony of Joseph Berke, the plaintiff and class representative in one of the related suits, 78 C 2480, and is found in Transcript p. 3510.

**10.** Hereafter in this Memorandum, Carter Hawley Hale will be referred to either as Carter, or by the acronym CHH, as the context may require.

the New York law firm of Skadden, Arps, Slate, Meagher & Flom. On December 9, 1969, they employed the services of Joseph H. Flom of that firm, a lawyer whose expertise was in proxy contests, mergers and acquisitions, tender offers and going-private transactions. Flom, after becoming acquainted with Field's position in the department store industry, including its financial standing and potential, gave the directors his advice on what they should do when the company was confronted with any inquiry or expression of interest in being acquired or being the subject of a merger. He also advised the company's executives on how to react to the prospect of a takeover.

He told the directors, and through them the executives, that in each instance when an acquirer expressed interest or the proposer of a merger made an approach to Field, representatives of management should listen, bearing in mind that the interests of the company's shareholders were paramount. They were to respond by indicating that Field was not on the block, and if the particular executive believed the suggestion of acquisition or the proposal of merger was being made seriously, he should express the views of the directors that, in their business judgment, the interests of Field shareholders would be best served by the company remaining independent. Flom advised that directors and those who manage a company should always keep in mind that the timing of the sale of a business, if a sale is to take place, is very important; that if a company, through its management executives, saw and believed that its future was bright, or that the general economic conditions would be more propitious in the future, the directors had the right to decide when the business would be sold, as well as whether this should be done. He told the directors that just because someone approaches a company, no one in that company had any obligation to say automatically that the company was on the block. He further advised the directors that management should always endeavor to determine whether a person proposing an acquisition of the company, or a merger with it, had

thought through the proposal being made; whether they were serious; and also whether they had considered the antitrust implications of an acquisition or merger. Flom was retained and, after December 1969, either he or a member of his firm attended each meeting of Field's board of directors.

Later, when his advice was sought by Field's executives concerning how they should deal with an inquiring potential acquirer, or one who was suggesting a merger, Flom, or one of his partners, repeated in general the advice he had given the directors when he was retained in 1969. On one occasion, he advised Field's chief executive officer that whenever a discussion was had with anyone seriously discussing acquisition of Field, potential merger, or the possibility of making a tender offer, at least two persons should attend such a meeting. Details of such transactions should be discussed informally and, preferably, an investment banker or financial officer should not be present. He advised that management personnel representing Field should always listen to what the visitor had to say. If a proposal was outlined, the executive was not to turn if down or argue about it, was never to say that it sounded good; but was simply to say that it was interesting. The executive was advised to say to the proposer that his proposal would be considered and that management would get back to him. Flom urged Field's chief executive officer that he should always find out who the visitor represented and whether he had authority to make a proposal. If he is speaking for someone else, the Field representative should learn all that he can, factual and financial, about the interested party. Field's representative should always inquire about the existence of antitrust issues and whether these had been considered. Flom admonished that anyone speaking for Field should remember at all times that his job was to do the best that could be done for the company's shareholders.

Flom's advice was accepted and followed. Every Field executive who had either a telephone conversation or meeting with any

inquirer concerning possible acquisition of or merger with Field, or a proposed tender offer or exchange offer, wrote a memorandum that became part of the business records of the company. Many of these memoranda are evidence in this joint trial, having been produced by defendants during pretrial discovery in these cases.

In the ten-year period between the time CHH first expressed an interest in Field and 1977, at least three other department store companies, in one way or another, did the same. For example, in 1970, Associated Dry Goods Company expressed a desire to merge with Field. This expression of interest, and the contacts of Field executives with representatives of Associated, were described in memoranda and made part of the company's files. At meetings of the board, the subject was discussed; and after considering the matter, the directors voted, reaffirming their earlier decision that Marshall Field should remain independent. At about the same time that the approach by Associated was considered, Field acquired Halle Brothers, a retailer with stores in Cleveland and other Ohio communities, and in Erie and West Erie, Pennsylvania. Associated had stores in the same cities.

In 1975, Federated Department Stores made acquisition overtures to Field. Again, all of the contacts with representatives of this potential acquirer were made the subject of memoranda that became part of the company's business records. The subject was submitted, with recommendations and views of management, to Field's board of directors. After consideration, the board concluded that remaining independent provided Field with a future that had greater possibilities than being acquired by another company. The board notified Federated that it did not wish to explore the matter further.

In August of the following year, Dayton-Hudson Corporation of Ohio inquired of Field's management about a possible acquisition of the company. Again, Field's executives met with spokesmen for Dayton-Hudson, recorded in memoranda what they said, and reported the inquiry to the board.

The directors, after considering the contact, decided that it was in the best interest of the shareholders and the company that Field remain an independent department store. At the same time the Dayton contact was being considered, Field's management, executing policy decisions of the board, sought to show to the public that the company had the ability to grow. Accordingly, management personnel embarked on a program to acquire certain Liberty House Stores in Portland, Oregon and Tacoma, Washington, a market area where there was an overlap between Dayton-Hudson stores and those operated by Liberty House. When Dayton-Hudson later withdrew its acquisition overtures in May, 1977, Field's interest in the Liberty House stores subsided. Subsequently, all inquiries made of Field by companies wanting to acquire it or negotiate a merger were met by the directors with the same conclusion: it was best for the company that it remain independent. This conclusion was expressed so many times that at least two directors who are defendants in these cases recall it being stated as a policy. The occasions when the directors reflected this policy were all recorded either in memoranda which became part of the company's records, or in minutes of board meetings. Prior to December 14, 1977, however, no communication of the board to Field's shareholders, no press release, nor any report Field made to any state or federal regulatory agency contained any statement or description of this policy.

In 1977, the president and chief executive officer of Field was Joseph A. Burnham, an executive who nationally enjoyed a good reputation among leaders of the department store industry. The company's directors, however, thought that Field needed someone to "turn the company around"; they came to believe Burnham needed help at the highest level of management. Therefore, it was decided that Field should seek an experienced department store executive who could work with Burnham and be groomed to succeed to the office of president and chief executive of the company. After a search that took Field's executives

throughout the country, with Burnham principally responsible for the search, the man who was selected and offered the position was Angelo R. Arena who, at the time, was chairman of Nieman-Marcus, the $500 million a year division of Carter Hawley Hale based in, Dallas, Texas. The agreement with Arena that he join Field later in 1977 was finalized in August of that year. It was expressly understood by Arena, Field's management, members of the board executive committee and Burnham in particular, that he was to join the company, work with Burnham and, if everything went well, in two or three years he was to succeed Burnham as president and chief executive officer of Field.

Having reached this understanding with Field's people, Arena then had a conversation in Los Angeles, California with Edward W. Carter and Philip M. Hawley who were, respectively, board chairman, president and chief executive officer of CHH. He told them that the opportunity he was being offered at Field was too attractive for him to refuse, and that even being chairman of an important CHH division did not have the career prospects equal to that being offered him by Field. Carter and Hawley told Arena that they did not believe Field was going to remain independent; that he, Arena, was chancing it in taking a job in the face of the possibility there will be a takeover of the company. Arena told his colleagues he had a conversation with Burnham in which he was assured that Field was going to remain an independent department store chain and, therefore, he thought that his decision to accept the position being offered him was one that he should make. Carter and Hawley agreed. Arena proceeded with plans to join Field late in 1977.

However, on October 10, 1977, while he was returning from a vacation, Burnham suffered a fatal heart attack. His death caused the executive committee of Field's board of directors to hold an emergency meeting on October 11, and the result was a recommendation that Arena be asked to come to Chicago immediately and replace Burnham as a Field director, its president

and chief executive officer. A special meeting of the board was called for October 13. Edward McCormick Blair, a Field director, attended the executive committee meeting. However, sometime during the day, while Blair was occupied with the emergency caused by Burnham's death, Edward W. Carter called Blair's 93 year old father and, after expressing condolences concerning Burnham's unexpected passing, told the elder Blair that in his view a merger between Field and CHH was an ideal business arrangement. Carter knew enough about the relationship between Blair, the Field director, and his father to know that his mention of the advantages of a Field-CHH merger would be discussed by them; it was. In addition, during the evening of October 12, the younger Blair received a telephone call from Gaylord Freeman, a banker long connected with Field's largest shareholder, the First National Bank of Chicago, who said he was calling for his friend Ed Carter to urge that the subject of a Field-CHH merger be discussed at the next meeting of Field's directors.

The next day, at the special meeting of the directors, after Arena had been elected and appointed to Burnham's old job, George C. Rinder, Executive Vice President of the company, reported on the contacts by Carter. A summary of the board minutes shows the entry that "[p]resumably the inquiry was prompted by the untimely death of Mr. Burnham. The consensus of the Board was that the Company's future plans are such that the proposed business combination should not be considered because the best interests of the Company's stockholders would be served by this Company's continuing as an independent entity in view of the many opportunities to increase earnings and return to the stockholders [sic]." Arena arrived in Chicago on Monday, October 17, and took over as head of the company's management.

CHH's approaches to Field about a possible merger did not cease; in fact, they gathered momentum. On the day Arena began his duties as the company's chief executive officer, Philip Hawley called him

from Los Angeles and urged him to consider the advantages of a Field-CHH merger. Arena reminded Hawley that he was just beginning some rather arduous duties; that Field, like all similar companies, was approaching the most important part of the department store sales year, the Christmas season; and that he wanted to get to understand Marshall Field and its business, and become acquainted with the people with whom he was to work. He told Hawley of feeling uncomfortable bringing to the board of directors the question of selling the company when he had been employed to lead it toward achieving what the directors had in mind for the future.

On the next day, from Philadelphia, Carter called Blair and asked him to consider his "ten fundamental reasons" why he thought a Field-CHH merger made sense. Blair listened, made notes and thanked Carter for his expression of interest. He assured Carter that Field thought highly of CHH; and that if Field should consider a merger with any company, CHH would get the first chance. Carter in turn told Blair that in the event of a merger, Blair would be an important director on the new combined board. Hawley, in the meantime, called Arena and insisted on a meeting of Field's representatives with those of CHH to discuss a merger; and that the meeting take place before the end of the Christmas shopping season.

Arena was disturbed by this insistence on the part of Hawley. The subject of mergers, acquisitions, and takeovers of another company were not strange to him. He knew the economic and business consequences of a takeover for, after all, he had just left Carter Hawley Hale, a department store chain which had grown through the acquisition of other companies. He had, in his short time with the Field management, learned of Joseph H. Flom's retainer by the company, and he was familiar with the advice Flom had given management and the directors. Arena knew that Flom's advice to his clients when faced with the prospects of an unfriendly takeover was to raise questions concerning possible violations of the antitrust laws. Arena knew that once a board of directors, in good faith, considers any merger proposal, one of the questions to be addressed is whether such a business combination was legal. Therefore, on November 16, 1977 he asked Hammond Chaffetz of the Chicago law firm of Kirkland & Ellis to analyze the antitrust implications of a merger between Field and CHH.

Kirkland & Ellis had been Field's counsel for antitrust matters since 1971. Chaffetz immediately headed a team of Kirkland lawyers who studied the matter. On November 17 Arena reported to the board of directors the contacts from CHH about a merger and his inquiry about the antitrust questions to Kirkland & Ellis. He and Rinder were authorized to "sit down with [CHH] and visit with them on a friendly basis," but not to depart from the board's stated position on the matter. The meeting took place in Arena's Ritz Carlton Hotel suite in Chicago on November 18, and it was attended by Carter, Hawley, Arena and Rinder.

Carter and Hawley did most of the talking, with Carter saying at the outset that a merger of Field and CHH was an objective he had pursued for twenty years. He referred to his previous discussions with Field's three former chief executive officers. He pointed out the advantages of such a merger, especially its size, which he and Hawley expected to ultimately grow into a $10 billion a year business. He said that a combination of the two companies would be the best fit in American retailing, making it the most exciting business event in the history of American department stores. Hawley reviewed the comparative worth of CHH and Field. He emphasized the high quality of the department store name which Field represented, one that could be taken anywhere in the country with the possible exception of California, where expansion of Field was not feasible because of CHH's dominance through its four department store divisions. Reference was made to Field's vulnerability to a takeover by other companies, particularly foreign ones. Either Carter or Hawley mentioned the interest of Brenninkmeyer, a for-

eign company they thought would make Field the object of a takeover. Carter said that this foreign company "might well offer $60.00 per share [to Field stockholders] at any time."

In response, Arena told Carter and Hawley that he understood there were some antitrust questions in any merger of the two companies. They answered by saying that they had been advised by their attorneys "that there is no antitrust deterrent." They agreed that there existed one overlap in the competitive area of the two companies, the Northbrook Court store of Nieman-Marcus; but that sale could be arranged for that business which at the time had annual sales exceeding $16 million. No mention was made by either Carter or Hawley of their Michigan Avenue site, or their plans to enter the Oakbrook Shopping Mall. The meeting ended with Arena expressing confidence in the future of Marshall Field, and saying that the question of unfriendly approaches by another company was something Field was living with. Arena emphasized that neither he nor the directors felt that the degree of urgency was as great as CHH was expressing. He concluded the meeting by stating that he and Rinder would report to the executive committee in about two weeks and that the board would meet on December 15, 1977, at which time the subject matter concerning CHH's approach about a merger would be discussed. Arena promised that he would keep them informed of the board's position regarding possible acquisition of Field by CHH. There was no commitment to meet again, or to contact CHH by any particular date.

The subject of the meeting, however, was not forgotten. On December 2, 1977, Chaffetz advised Arena and Rinder that in the opinion of Kirkland & Ellis lawyers, an acquisition of Field by CHH, or a merger of the two companies, would be illegal under the antitrust laws because of (a) the existing competition between Field's stores and the store operated in the Northbrook Court shopping enter by CHH's Nieman-Marcus division; (b) the potential competition between Field's stores and the stores on North Michigan Avenue and in Oakbrook which Nieman-Marcus was planning to open; and (c) the existing competition between Field's stores and the stores operated by CHH's Walden Books division. In forming this opinion, Kirkland lawyers relied on the 1976 CHH annual report issued in the spring of 1977, in which the company announced the intention to expand its Nieman-Marcus division and take advantage of the Chicago market. In this report, CHH recognized the splendid market for luxury fashion merchandise on North Michigan Avenue in Chicago, and emphasized its purchase of a large block of land on the avenue for further development. Prior to that report, CHH had in fact acquired property on Michigan Avenue, less than two blocks south of Field's Water Tower Place store, and announced the intention to build a Nieman-Marcus store almost adjacent to the Field location. The lawyers also considered Nieman-Marcus' interest in opening a store in the Oakbrook area, an interest that was publicly disclosed by CHH. In addition, the Kirkland lawyers took into account the fact that Field was the second largest book seller in the Chicago area, while CHH-owned Walden Books was a major factor in the Chicago book selling market. Up to the time that the lawyers formed the antitrust opinion which was conveyed by Chaffetz to Arena and Rinder, CHH had never formulated nor announced a plan for disposal of any of its Chicago stores which did business in competition with Field, a factor crucial to any reasonable antitrust analysis. Chaffetz's report, giving the opinion of Kirkland lawyers, was communicated to Field's directors. The matter remained in that posture until Saturday, December 10, 1977.

On that day, Philip Hawley called Arena and told him that unless Field directors agreed to begin merger negotiations by Monday, December 12, he would deliver and make public a letter proposing that the directors of the two companies enter into negotiations leading to a combination of Field and CHH. He told Arena what the letter would say. Generally, CHH would propose beginning negotiations with the

idea that for each share of Marshall Field common stock, CHH would exchange a number of its shares determined by dividing $36.00 by the average closing price of CHH common stock on the New York Stock Exchange during a period of thirty trading days immediately preceding the mailing of proxy statements relating to the transaction, with an election feature which would give Marshall Field shareholders the opportunity to receive up to 49% of the exchange in cash. Appropriate provisions were to be made for holders of Field's preferred stock and those persons who had the right to exercise stock options.

Arena construed what Hawley told him as the initiation of an unfriendly takeover of Field by CHH. Therefore, he immediately reached Joseph Flom in New York and arranged a meeting in the Skadden, Arps office on Sunday, December 11 with key Field directors and investment bankers present. The meeting was held and there was a general discussion about what to do the next day when the letter described to Arena by Hawley was delivered. Arena reported the opinion of Kirkland & Ellis lawyers concerning the legality, under the antitrust laws, of a Field-CHH merger. It was agreed that those directors who were absent were to be polled, by phone, for their authorization that a lawsuit be filed in this court asking for resolution of the antitrust issues which, in the opinion of Kirkland lawyers, were inherent in CHH's proposal for a merger. It was also agreed that the New York Stock Exchange would be informed of the development; and that an emergency meeting of the Field board of directors was to be called for Tuesday, December 13.

Events transpired as anticipated. On Monday, December 12, CHH's letter signed by Hawley was received. The letter, as it turned out, reviewed the advantages of the merger to be negotiated, referred to the gains Field shareholders would derive from the combination of the two companies, and ended with the statement that if Field should decline to meet for the proposed negotiation, CHH "will not be bound by these proposals in any offer or other action which we may elect to pursue in the future." Field directors were contacted by telephone, and all but one approved the filing of an antitrust lawsuit in this court by Kirkland & Ellis.

The special meeting of Field directors took place, as scheduled, on December 13 with all board members present. Also at the meeting were three lawyers from the Skadden, Arps firm: Flom, Aaron and Pelster; Chaffetz of Kirkland & Ellis; and representatives of Field's investment bankers: William Blair & Company and Smith Barney, Harris Upham & Company, Inc. The lawyers, particularly Chaffetz, gave the directors their opinion concerning the legality of the merger toward which the December 10 letter proposed negotiation, and the investment bankers evaluated the financial aspects of the merger. The CHH letter was reviewed, each director having received a copy by then. Arena, who presided, asked Chaffetz to give his views concerning antitrust implications of a Field-CHH merger. Then Flom and Chaffetz discussed the general legal status of the entire situation, as it then existed. Representatives of the investment bankers presented their report and discussed the financial aspects of the matter.

Questions were asked by board members. Management, represented by Arena and Rinder, made a report and projected the company's expected performance. Generally, the view was that future performance would be favorable. Many of the directors, as did the investment bankers, thought that a share of Marshall Field stock would bring more than $36.00 in a sale or merger of the company. After discussion and consideration, on motion duly made and seconded, the directors unanimously voted to reject the proposal contained in the December 10 letter from CHH because, in their judgment, any merger of Field with CHH would be "illegal, inadequate and not in the best interests of Marshall Field & Company, its stockholders and the communities which it serves." Then the board adopted two resolutions, one ratifying the filing of the antitrust suit and the other giving officers of

the company authority to take such action as they deemed necessary in connection with the CHH matter, including the filing of such reports and documents with the SEC and other governmental agencies as may be necessary.

Contemporaneous with their vote, the directors authorized issuance of a release to the press confirming receipt of the December 10 letter, referring to the filing of the antitrust suit alleging that acquisition of Field by CHH would constitute a violation of the federal antitrust laws, and disclosing the advice the directors had received from Kirkland & Ellis on the antitrust questions. Two days later, Arena wrote Hawley a letter telling him of the board's action on his December 10 merger negotiations proposal. On the same day, December 14, Field issued a press release in which Arena spoke for the company and described the board's position on the December 10 CHH letter. He said that Field's directors and management had faith in the momentum of the company, and that "it would be in the best interests of our stockholders, customers and employees for us to take advantage of this momentum and continue to implement our growth plans as an independent company."

The next day, Arena addressed a letter to all Field employees telling them that CHH was "seeking to take over Marshall Field & Company." He reviewed, in general terms, what had transpired, including "the aggressive and insensitive way [CHH has] pursued Marshall Field & Company." On December 20, he addressed a letter to Field stockholders in which he reviewed his observations of the company since assuming the responsibilities Burnham had discharged before his death. He spoke optimistically of the future, reviewed Field's immediate past performance, referred to the CHH proposal for negotiation, referred to the advice of antitrust counsel "that a CHH–Marshall Field & Company merger would clearly violate the United States antitrust laws," and concluded that "[y]our Board of Directors believes the maximum benefits for Marshall Field & Company and its stockholders, employees, customers and communities it serves will result from continuing to devel-

op as an independent, publicly-owned Company."

CHH's response to the board's rejection of its proposal was a press release issued January 4, 1978 reporting reaffirmation of the desire of its directors to negotiate a merger with Field. Hawley was quoted as expressing the belief "that a negotiated merger of Carter Hawley Hale and Marshall Field is desirable for both parties and legally possible." Thereafter, no contact or communication was made by either company concerning the subject of a merger negotiation. The following day, however, Field issued a press release announcing that it had amended the complaint in its antitrust suit against CHH to add allegations of federal securities laws violations said to be connected with CHH's proposed acquisition of Field. Arena was quoted at the end of the release as saying that "our management is continuing the implementation of our long-standing programs to further build and develop the business of Marshall Field & Company. We are confident that all these programs are on course and are optimistic about our progress."

On January 19, 1978, Field directors had their regular meeting. On the agenda was a proposal that the company expand into Texas, and one that it acquire Liberty House Stores, three of which were located in Portland, Oregon, and two in Tacoma, Washington. Field had business operations in the Pacific Northwest through its Fredrick & Nelson division in Seattle, and its The Crescent subsidiary in Spokane. As to the southwest section of the country, Field executives and directors had considered acquisitions in that area. Investment analysts such as Stanley H. Iverson of Duff & Phelps, Inc., a knowledgeable investment advisor who had followed Field's business and market performance for years, had known of the company's general interest in expanding its Chicago division into the southwest area of the country, although no Field executive had ever particularly mentioned Houston, Texas.

The subject of expansion into other parts of the country, and the acquisition of other stores, had been dealt with by Field directors informally at first, and later through a development committee made up of lawyers, representatives of investment banking firms that advised the board, certain Field key executives, and some of the directors. When Flom was retained in 1969, one of the details of his legal advice to the directors and executives was to invest the company's accumulated reserves and adequately utilize its borrowing power in acquiring other stores. Flom advised that at all times such decisions had to be made consistent with sound business judgment, and in the best interest of the company and its shareholders. From his experience as a lawyer who had represented both acquirers and target companies, he told Field executives and directors that acquisitions were a lawful and legal way of coping with an unfriendly takeover. He was critical of the directors and the company's management in not fully exploiting Field's capacity to expand. It was Flom's view, one he expressed to Field's directors and executives when he gave them legal advice, that once, for sound business reasons, the decision was made to resist a takeover, a defensive acquisition was a legal and proper step for a target company to take, provided that the directors' decision to resist a takeover is reasonably related to the interests of the shareholders, the company, and the community it serves. At the December 11 meeting in his office, Flom reminded Field directors, in the presence of Arena, that he had urged them to make more acquisitions, but they had not followed his advice.

Flom was present on January 19 when the proposed expansion and acquisition were before the directors. Arena distributed a report that reviewed the Liberty House Stores, and the discussion that followed was premised on Field's purchase of their inventories, fixtures, and other assets. He told the board that the Tacoma market was clearly a place where the Fredrick & Nelson division should be operating, and Portland was a natural area for that division's operations. He recommended that

officers of the company be authorized to enter into a letter of intent pertaining to acquisition of the five stores. The recommendation was approved by unanimous vote of the board and, accordingly, a formal resolution was adopted.

As to the expansion into Texas, Arena introduced the company's vice president for real estate who discussed management's investigation of four possible Texas locations. Specifically, he commented on The Galleria in Houston, Texas, and three others. After considering demographic details and other data, Arena asked that management be given authority to pursue The Galleria in Houston as a future location for a new Marshall Field store. This request was granted unanimously. On January 20, 1978, a letter of agreement for acquisition of the five Liberty House Stores was executed by the parties, and on that day Field announced the acquisition for the purpose of integrating these stores into its Seattle-based Fredrick & Nelson division. Then on February 2, 1978, a letter of agreement was executed for acquisition of a store location, and expansion of its Chicago division, in The Galleria shopping complex in Houston, Texas.

The day before the last letter was signed, Carter Hawley Hale, as required by law, filed documents with the Securities & Exchange Commission and announced its intention to make an exchange offer by which each Field shareholder who wanted to tender his shares would receive, for each share he owned, $42.00 in a combination of cash and CHH stock. The offer, however, could be accepted only after the Securities & Exchange Commission reviewed and declared the registration statement effective, and holders of a majority of outstanding CHH capital stock approved the offer at a shareholder's meeting to be held on an undetermined date in the future. Further, CHH's intention to make the offer was subject to the condition that if holders of 5% or more of its common stock dissented, they would be entitled to receive what their shares were worth on January 31, 1978, and at that time, CHH would have the option of withdrawing the offer.

Formal notice of this filing was served on Field directors, its president, law vice president and secretary. At a special meeting of the board on February 2nd, CHH's filing was discussed, its legal implications described to the directors by Aaron of the Skadden, Arps firm, and by Hammond Chaffetz of Kirkland & Ellis. In addition, Chaffetz brought the directors up to date on developments in the Field suit then pending in this court. Then, the directors took up a number of proposed acquisitions, including The Galleria in Houston, Texas. There was no mention of the adequacy or the inadequacy of the $42.00 per share price which CHH announced it intended to pay sometime in the future for each share of Field stock. After the board meeting, Field issued a press release in which Arena said that the company's "opposition to the takeover bid by Carter Hawley Hale is unchanged." The release concluded with the statement by Arena that "I assumed my position with Marshall Field & Company with the understanding that I would devote myself to making Marshall Field & Company a truly national retail business organization. We at Marshall Field & Company are determined not to be deterred from this course. Our recently announced agreement to acquire five Liberty House Stores in Tacoma, Washington and Portland, Oregon, was one step in our program."

No other communication occurred between the parties until February 22, 1978. Before that, on February 8, Arena announced, in a press release, that Field had concluded negotiations for a 200,000 square-feet, full line department store to be located in The Galleria complex, Houston, Texas. Then on February 22, CHH informed Field and the public that it was withdrawing its proposed exchange offer because "the expansion program announced by Marshall Field since February 1st has created sufficient doubt about Marshall Field's earning potential to make the offer no longer in the best interest of Carter Hawley Hale's shareholders." None of the events that

conditioned CHH's intention to make the offer had occurred since February 1, 1978. It had not purchased any Field shares; no Marshall Field shareholder was ever solicited to sell any share owned; no publicity was engaged in either by CHH or by Field concerning solicitation of Marshall Field shares; and no opportunity was ever given to any Field shareholder to tender any share he owned in Marshall Field & Company.

## II.

■ These, then, being the facts most favorable to the plaintiff which in this court's judgment the jury can reasonably find from the evidence, defendants' motion for a directed verdict [11] presents a question of law: whether when all the evidence is considered, together with all reasonable inferences favorable to the plaintiffs, it totally fails to prove a necessary element of their case. *Riggs v. Penn Central Railroad Company,* 442 F.2d 105, 106 (7th Cir. 1971). It is recognized and the court bears this in mind, that since a directed verdict will deprive plaintiffs of a determination of the facts by the jury, a motion therefor should be sparingly granted. *Farner v. Paccar, Inc.,* 562 F.2d 518 (8th Cir. 1977); *Clemons v. Mitsui O. S. K. Lines, Ltd.,* 596 F.2d 746 (7th Cir. 1979). Nevertheless, if the facts and inferences point so strongly and overwhelmingly in favor of defendants that the court is convinced reasonable men cannot arrive at a verdict contrary to one in their favor, granting of the motion is proper. *Boeing Company v. Shipman,* 411 F.2d 365, 374 (5th Cir. 1969); *see Neugebauer v. A. S. Abell Co.,* 474 F.Supp. 1053 (D.Md.1979). The rule is well established that when the evidence in a case is such that without weighing the credibility of witnesses there can be but one reasonable conclusion as to the verdict to be reached, a district judge should determine the proceeding by directing the verdict, without submission to the jury; such direction will have the result of

11. The motion under Rule 41(b), Fed.R.Civ.P., will be treated by the court as a motion for directed verdict. *Johnson v. Chicago, Milwaukee, St. Paul & Pacific R. Co.,* 400 F.2d 968 (9th Cir. 1968).

saving the mischance of speculation over legally unfounded claims. *See Brady v. Southern Ry. Co.,* 320 U.S. 476, 479–80, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943); 9 Wright & Miller, Federal Practice and Procedure § 2524 (1971). As the court of appeals for this circuit has held, a district judge should direct a verdict where the evidence, with all justifiably deducible inferences, will not support a verdict in favor of the party producing it. *Hohmann v. Packard Instrument Company, Inc.,* 471 F.2d 815, 819 (7th Cir. 1973). Whether, in this case, a verdict should be directed is determined by the law that controls the controversy between the parties, law which this court would instruct the jury it must follow if asked to deliberate and reach a verdict.

### III.

#### A. *Plaintiffs' Section 10b and Rule 10b–5 Claims*

The statute under which plaintiffs make these claims, Section 10b of the Securities & Exchange Act of 1934, 15 U.S.C. § 78j(b), provides that "[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Rule 10b–5, adopted by the Securities and Exchange Commission and published in 17 C.F.R. § 240.10b–5 (1977), states that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Based on this statute and rule, plaintiffs seek to recover as members of a class of "persons who held common stock of Marshall Field & Company at any time between December 12, 1977 and February 22, 1978." This class, prior to trial, was divided into four subclasses consisting of (1) persons who held Field's stock on or prior to December 12, 1977 and disposed of it after that date but prior to February 22, 1978; (2) persons who acquired Field's stock after December 12, 1977 and disposed of it prior to February 22, 1978; (3) persons who acquired Field's stock after December 12, 1977 and did not dispose of it prior to February 22, 1978; and (4) persons who held Field's stock on or prior to December 12, 1977 and did not dispose of it prior to February 22, 1978.

Plaintiffs contend, from the evidence heard, that between October 11, 1977 and February 28, 1978, when CHH withdrew its proposed exchange offer, defendants as directors of Marshall Field had a policy of keeping the company an independent business entity, a policy formulated years before; that this policy was not disclosed to Field shareholders who made investment decisions in purchasing or selling Marshall Field shares; that during the period in question, defendants made material misstatements in press releases and letters designed to influence investment decisions by the shareholders; that they omitted making material disclosures concerning the policy they were administering as Field directors; that on or about December 13, 1977, defendants arbitrarily rejected a proposal made by

Carter Hawley Hale for negotiation of a merger with Field; and that in doing these things, defendants engaged in manipulative, deceptive, and fraudulent conduct, knowingly recklessly, and with full knowledge of the consequences to the rights of the plaintiffs-shareholders affected. Plaintiffs insist that the evidence now in the record shows defendants made defensive acquisitions by which they succeeded in depriving Field stockholders of the opportunity to sell their shares at an advantageous price. These acts of the defendants, according to the plaintiffs, were committed, not in the interest of Field shareholders, but solely to perpetuate themselves in office as directors of the company.

The evidence shows that all of the corporate decisions about which plaintiffs complain were made by defendants in their capacity as directors of Marshall Field. It is the law, which the jury would have to follow were it to deliberate to a verdict, that the general authority and power of defendants as Field directors during the period in question was to manage the corporate business and affairs for the stockholders, and their authority at all times was absolute, as long as they acted within the law. Questions of policy and internal management were, in the absence of nonfeasance, misfeasance or malfeasance, left wholly to their decision. 5 Fletcher, Cyclopedia of the Law of Private Corporations § 2100 (1976 rev. vol.); see Shlensky v. Wrigley, 95 Ill.App.2d 173, 237 N.E.2d 776 (1968). The laws of the State of Delaware governing the powers of corporate directors give defendants this authority. See Del. Code Tit. 8, § 141(a). Directors of a publicly owned corporation do not act outside of the law when they, in good faith, decide that it is in the best interest of the company and its shareholders that it remain an independent business entity. Lipton, Takeover Bids in the Target's Boardroom, 35 The Business Lawyer 101, 130 (1975). Having so determined, they can authorize management to oppose offers which, in their best judgment are detrimental to the company and its shareholders. Northwest Industries, Inc. v. B. F. Goodrich Company, 301 F.Supp.

706, 712 (N.D.Ill.1969). Certainly acquisitions, expansions, and the purchase of new stores are management decisions which, even though some shareholders may consider them breaches of fiduciary duty, are not grounds for liability under Section 10b or Rule 10b–5 unless there is deception, misrepresentation, or nondisclosure in violation of the statute and the rule. Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 476, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977).

These principles have to be considered together with another well settled rule. There can be no violation of Section 10b or Rule 10b–5 unless the evidence establishes that the person or persons charged with such violation committed three acts in connection with the transaction in question: (1) used the mail or other instrumentality of interstate commerce; (2) purchased or sold a security, or sought to affect the same; and (3) used a manipulative or deceptive device. See Olympic Capital Corporation v. Newman, 276 F.Supp. 646, 653 (C.D.Cal. 1967); accord Cameron v. Outdoor Resorts of America, Inc., 608 F.2d 187 (5th Cir. 1979) and Securities & Exchange Commission v. Diversified Industries, 465 F.Supp. 104 (D.D.C.1979). The term "purchase or sale" as used in the section and rule is not limited to common law transactions. Spector v. L Q Motor Inns, Inc., 517 F.2d 278, 285 (5th Cir. 1975), cert. denied 423 U.S. 1055, 96 S.Ct. 786, 46 L.Ed.2d 644; see Annot. 4 A.L.R.Fed. 1048. Exchange of shares in connection with the merger or sale of corporate assets constitutes a purchase or sale within Section 10b and Rule 10b–5. Securities & Exchange Commission v. National Securities, 393 U.S. 453, 467, 89 S.Ct. 564, 572, 21 L.Ed.2d 668 (1969); Swanson v. American Consumer Industries, Inc., 415 F.2d 1326, 1330 (7th Cir. 1969).

More importantly, in all such cases, the evidence must prove that the person or persons engaged in such sale or purchase, as defined, did so with intent to deceive, manipulate or defraud. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193, 96 S.Ct. 1375, 1380, 47 L.Ed.2d 668 (1976). The expression

"any manipulative or deceptive device or contrivance," used in the statute and found in the rule, proscribes knowing or intentional misconduct. *See Securities & Exchange Commission v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 868 (2nd Cir. 1968) (Friendly, J., concurring), *cert. denied* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); Loss, *Summary Remarks*, 30 Business Law 163, 165 (special issue 1975). This is conduct quite different from negligence. "Use of the word 'manipulative' is especially significant. It is and was virtually a term of art when used in connection with securities markets. It connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder, supra* at 199, 96 S.Ct. at 1384; *see Klamberg v. Roth*, 473 F.Supp. 544, 549 n.8 (S.D.N.Y.1979); Annot. 3 A.L. R.Fed. 819.

▪ In this case, there is no evidence from which the jury could find that during the period relevant to this controversy any defendant engaged in the purchase or sale of any security, no matter how the term is defined. Additionally, while it is true that Marshall Field shares have always been sold on the open market, there is no evidence that in making their managerial decisions as to remaining independent, making acquisitions, and expanding the business of Marshall Field, defendants in any way acted with intent to deceive investors by controlling or artificially affecting the price of securities. *Cf. Ernst & Ernst v. Hochfelder, supra* 425 U.S. at 199, 96 S.Ct. at 1383.

The law and evidence, particularly the minutes of the meetings of Field's directors and the letters and press releases of defendants in response to merger proposals and the proposed exchange offer, simply do not support plaintiffs' allegations that the defendants violated Section 10b or Rule 10b–5 by intentionally and deceptively failing to disclose their policy of remaining independent so as to manipulate the price of the company's stock. Therefore, plaintiffs' evidence does not present a jury question on their claims under Section 10b or under

Rule 10b–5. *See Sanders v. John Nuveen & Co., Inc.*, 554 F.2d 790 (7th Cir. 1977).

**B. Plaintiffs' Sections 14(d) and 14(e) Claims**

▪ The provisions of law plaintiffs here invoke are two of the 1968 amendments to the Securities & Exchange Act of 1934, sometimes collectively referred to as the "Williams Act," and are found in 15 U.S.C. § 78n(d–f). *Bath Industries, Inc. v. Blot*, 427 F.2d 97 (7th Cir. 1970). Section 14(d) prohibits the making of a tender offer for any class of a registered stock if, after consummation, the offeror would own more than five percent of the class, unless a Schedule 13D form is first filed with the Securities & Exchange Commission. *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d 1195, 1205–1206 (2d Cir. 1978). Section 14(e), on which plaintiffs particularly rely in this case, provides that

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

The sole purpose of Congress in adopting these amendments "was the protection of investors who are confronted with a tender offer." *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977). The Williams Act amendments were intended "to insure that the public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without ade-

quate information." *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12 (1975). The critical phrase in Section 14(e) is "in connection with any tender offer." *Lewis v. McGraw*, [Current Binder] Fed.Sec.L.Rep. (CHH) ¶ 97, 195 (S.D.N.Y.1979). Therefore, in order for Sections 14(d) and 14(e) to become operative, there must be an exchange or tender offer, or at least the announcement of one, because when "a public announcement of a proposed offer has been made, the very dangers that the Act was intended to guard against come into play, and the application of sections 14(d) and 14(e) is thus appropriate." *Applied Digital Data Systems, Inc. v. Milgo Electronic Corp.*, 425 F.Supp. 1145, 1155 (S.D.N.Y.1977); *cf. Corenco Corp. v. Schiavone & Sons, Inc.*, 488 F.2d 207 (2d Cir. 1973). In view of plaintiffs' emphasis of this securities law concept, it is necessary that the term "tender offer" be defined.

■ Neither the Williams Act nor the rules adopted by the Securities & Exchange Commission attempt to define these words. However, from judicial decisions and scholarly works, it can be seen that a tender or exchange offer may be any proposal, by an individual, group or corporation, made through public announcements or other means of communication, to purchase securities made in a manner "likely to pressure shareholders into making uninformed, ill-considered decisions to sell." Note, *The Developing Meaning of "Tender Offer"*, 86 Harv.L.Rev. 1250, 1281 (1973) *quoted in Kennecott Copper Corp. v. Curtiss-Wright Corporation*, 449 F.Supp. 951, 961 (S.D.N.Y. 1978), *aff'd in part, rev'd in part*, 584 F.2d 1195 (2d Cir. 1978); *see* E. Aranow, H. Einhorn & G. Berlstein, *Developments in Tender Offers for Corporate Control*, 1–34 (1977). The offer must be stated in terms which will induce the tender of shares by shareholders who wish to sell.

■ The evidence at the close of plaintiffs' case shows that in the month of October 1977, Edward Carter and Philip Hawley of Carter Hawley Hale made approaches to Field about the possibility of a merger between the company and CHH. Under the laws of Delaware which govern the issue here, a merger proposal to Field had to be approved by defendants, as directors, before it could be presented to the shareholders. *See* Del. Corp. Law § 251. The courts of that state give directors of Delaware corporations the benefit of a presumption that their judgment in dealing with any plan of merger is made in good faith and attributable to a rational business purpose. *E. g., Muschel v. Western Union Corporation*, 310 A.2d 904, 909 (Del.Ch.1973). Acting on their authority, therefore, defendants asked Angelo Arena and George Rinder to meet with Carter and Hawley and discuss what they had in mind. A day or so before going to the meeting, Arena had talked with Field's antitrust counsel concerning possible antitrust violations in the merger Carter and Hawley were thinking about. It appears to be without question that had there been a merger of CHH and Field, it would have been the largest one in the history of department stores in this country. There were reasons to believe that antitrust issues existed. CHH was a Field competitor in the Chicago market; its announced plans were to expand that competition.

At the meeting, Arena brought up the possibility of antitrust violations; Carter and Hawley insisted there were none. When Arena said he understood the contrary, one or the other of the two men replied, giving the views of "their attorneys that there is no antitrust deterrent" to the merger they had in mind. They said that the one overlap, Nieman-Marcus' Northbrook Court store, could be sold because it was a highly successful operation. This disposition, they thought, would cure any antitrust problem. No mention was made of the Michigan Avenue site nor of CHH's announced plans to enter the Oakbrook shopping mall. The meeting ended on a friendly note with no understanding of further contacts.

Three days later, Rinder met with two Kirkland & Ellis lawyers, discussed with them the antitrust implications of a Field-CHH merger, and directed that they be

furnished information and data that had been requested. Then, on December 2, Hammond Chaffetz, who had headed the Kirkland & Ellis research into the antitrust questions, gave Arena the opinion of the lawyers. Chaffetz stated that after studying the market operations of the two companies, he and his colleagues had concluded that any merger of Field and CHH would violate the federal antitrust laws. It is reasonable to infer that the substance of Arena's conversation with Chaffetz was conveyed to defendants; and that from the origin of Carter's contact on October 11 to December 13, 1977, the general subject of a merger of Field and CHH was studied and considered by defendants, the lawyers who advised them, Field executives, the company's investment bankers, and the accountants.

On December 10, 1977, Arena received a telephone call from Hawley. That day, as any juror would notice since jurors are good at noticing a mundane fact like this one, was a scant two weeks from Christmas. Field was in the midst of the most important shopping period of the business year, with Arena just becoming adjusted to his new position as its chief executive officer. Hawley told Arena that unless defendants authorized the immediate beginning of merger negotiation discussions with CHH, he would deliver and make public on December 12 a letter outlining a proposal he and Carter had in mind. Hawley knew the impact of this threat on Arena, on Field, its directors and management. He also knew that public announcement of merger possibilities would influence transactions of Marshall Field shares on the exchanges. Arena was also aware of these consequences. He proposed to Hawley that he appear and discuss the subject of his telephone call at a special meeting of Field directors the following week. Hawley declined, saying that a meeting with the directors was not what he had in mind: he wanted the beginning of merger negotiations. The telephone conversation ended with the understanding that the letter would be delivered Monday, December 12.

Arena reacted by calling Joseph H. Flom, the lawyer for corporate matters that Field's directors had retained in 1969. They agreed to meet at the Skadden, Arps law firm office the next day in New York City. The meeting was held, attended by representatives of Field's investment bankers and key directors. Flom reviewed the advice he had given Field through the years. Arena reported the opinion of Kirkland & Ellis lawyers that a Field-CHH merger would violate the federal antitrust laws. It was decided among those present that the stock exchanges would be informed of the impending letter from Hawley and that a suit would be filed by Field against CHH in this court on Monday, December 12. These things were done and, on December 13, Field's directors, each having received a copy of the letter Hawley had described to Arena, held a special meeting. Present were lawyers from Kirkland & Ellis and from Skadden, Arps. Representatives from two firms of investment bankers appeared and gave their views on the subject of the CHH letter. Management representatives expressed views concerning the future of Field, on the whole favorable. Hammond Chaffetz of Kirkland & Ellis discussed in detail the reasons for the opinion he and his colleagues had reached on the antitrust issues present in any proposal to merge Field with CHH.

At the conclusion of the meeting, the directors unanimously decided to reject the proposal contained in the December 10 letter because in their judgment it was "illegal, inadequate and not in the best interests of Marshall Field & Company, its shareholders and the communities which it serves." The next day Hawley was advised of the board's decision by letter and, at the same time, a press release was issued giving the reasons for the board's actions, referring to the law suit that had been filed on December 12, and quoting Arena as saying that the directors believed "it would be in the best interests of our stockholders, customers and employees for us to take advantage of [the momentum of the company's future] and continue to implement our growth plans as an independent company." There-

after, defendants authorized officers of the company to proceed with the Liberty House Stores acquisition and with negotiations for a department store location in The Galleria complex, Houston, Texas.

Plaintiffs argue that their evidence showing this course of conduct requires defendants to put on a defense because it has been proven, prima facie, that they made untrue statements of material facts, they omitted stating material facts and engaged in fraudulent, deceptive, or manipulative acts or practices when they rejected the proposal contained in CHH's letter of December 10. Plaintiffs say that they have shown that defendants filed documents with the Securities & Exchange Commission, issued press releases, and wrote letters to employees and shareholders all of which contained untrue statements or material omissions. Plaintiffs insist that, prima facie, they have proven defendants filed the antitrust suit and made acquisitions of other businesses after December 10, not in the interest of Marshall Field and its shareholders but, rather, in support of their undisclosed policy of keeping Field an independent business entity and perpetuating themselves in office as directors of the company. Plaintiffs contend their evidence shows defendants violated Sections 14(d), 14(e), and rules promulgated by the Securities & Exchange Commission; and thus, the motion for directed verdict should be denied.

These contentions overlook the fact that sections 14(d) and 14(e) of the Williams Act apply only to conduct committed in connection either with a tender or an exchange offer, *S–G Securities, Inc. v. Fugua Investment Co.*, 466 F.Supp. 1114 (D.Mass. 1978); *see* Annot. 6 A.L.R.Fed. 906, or where there has been a public announcement of an intention to make one. *Applied Digital Data Systems v. Milgo Electronic*, 425 F.Supp. 1145 (S.D.N.Y.1977). The letter of December 10 was neither an exchange nor a tender offer, nor was it a public announcement concerning one. In fact, it was not even a merger proposal; it was only a request, shielded in a threat, that defendants and Field executives interrupt the company's business and engage in merger negotiations with CHH.[12] Therefore, there was no schedule or form which defendants had to first file with the Securities & Exchange Commission as required by Section 14(d); and clearly, their conduct with regard to CHH's proposal, was not "in connection with a tender offer" within the meaning of Section 14(e) of the Williams Act. This is also true of the proposed exchange offer CHH announced on February 1, 1978 when it made the Schedule 14D–1 filing with the Securities & Exchange Commission. The reasons, however, are different. A tender or exchange offer must be so expressed that "[t]he person making the offer obligates himself to purchase all or a specified portion of the tendered shares if certain specified conditions are met [by the shareholder]." H.R.Rep. No. 1711, 90th Congress 2d Sess., reprinted in [1968] U.S. Code Cong. & Admin.News, p. 2811; *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d 1195, 1206 (2d Cir. 1978). It can be made by issuance of a public announcement stating that after appropriate steps have been taken to comply with federal securities laws, and after securing authorization of the offeror's stockholders, the tender or exchange offer will be made directly to the target shareholders. *Applied Digital Data Systems v. Milgo Electronic*, 425 F.Supp. 1145 (S.D.N.Y.1977). A person

---

12. The court will not extend this memorandum to discuss the response, under applicable laws, which defendants as Marshal Field directors were obliged to give the letter written by Philip M. Hawley for CHH. In this court's judgment, that letter, in the context of the circumstances under which it was written and received, was an imposition on Marshall Field, its directors, and executives. The law vested defendants with discretion to decide the answer they were to give it, and the action they should have taken concerning it. *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 722 (Del.Supr.1971); *Kaplan v. Goldsamt*, 380 A.2d 556 (Del.Ch.1977). There is nothing in the legislative history of the Williams Act to suggest that Congress intended those amendments to modify the traditional powers of American corporate directors. See *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 25–37, 97 S.Ct. 926, 941–947, 51 L.Ed.2d 124 (1977).

is not obligated to purchase all or a specified portion of tendered shares if the offer is subject to a condition precedent, that is, "a fact or event which the parties intend must exist or take place before there is a right to performance." 5 Williston on Contracts 126, § 663 (3d ed.); Restatement of the Law, Contracts § 250; *United States v. Schaeffer*, 319 F.2d 907, 911 (9th Cir. 1963), cert. denied 376 U.S. 943, 84 S.Ct. 798, 11 L.Ed.2d 767 (1964).

CHH's proposed offer was subject to more than approval by the Securities & Exchange Commission and by holders of a majority of the shares of CHH capital stock. It was also subject to the condition that if holders of 5% or more of CHH shares formally dissented to the making of the exchange offer, they would be entitled to receive what their shares were worth the day before CHH announced its proposal; and upon the happening of that event, CHH would have the option of either proceeding with or withdrawing the making of the proposed offer. From February 1, 1978 when the proposed offer was announced, until February 22 when it was withdrawn, however, CHH did not proceed before the Securities & Exchange Commission to obtain the required approval of its intended offer, it did not call a meeting of its shareholders, and it never ascertained what percent of its shareholders would dissent from the making of the exchange offer. In addition to these conditions which were not met, CHH hedged its proposed exchange offer with nine other conditions precedent, none involving the mere passage of time and only one subject to CHH's control. None of these conditions were met, either, but defendants did nothing to prevent their occurrence or to prevent CHH from effectuating their occurrence. It is clear, also, that at no time did CHH purchase any Field shares, nor did it in any way solicit or urge any Field shareholder to sell. Consequently, in this court's judgment, CHH's announcement of February 1 and the SEC filing it made were not and never became an exchange offer.

But even if a contrary conclusion were reached on this point, the evidence shows that during the period in question defendants never made any untrue statement of a material fact or omitted the stating of any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; nor did they engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender or exchange offer or request or invitation for tenders or exchanges, or any solicitation of security holders in opposition to such offer, request or invitation. Defendants' only response to CHH's announcement of February 1 was a press release the same day, in which no reference was made to the proposed offer. Arena, as president and chief executive officer of Marshall Field, again reiterated defendants' acceptance of legal advice which told them that any combination of the two companies would violate United States antitrust laws. He referred to the conditions imposed on the proposed exchange offer by CHH. The release concluded with references to the acquisitions Field was making, and was intending to make in the future, and his determination to pursue "making Marshall Field & Company a truly national retail business organization." Neither at the board meeting held that day, nor at any other time, did defendants express any view concerning the adequacy of the proposed exchange offer. They did not solicit shareholders to either accept or reject the offer. Under these circumstances, the evidence at the close of plaintiffs' case shows that they cannot prevail on the claims they made under sections 14(d) and 14(e) of the Williams Act. *See Berman v. Gerber Products Co.*, 454 F.Supp. 1310 (W.D.Mich.1978); *Altman v. Knight*, 431 F.Supp. 309 (S.D.N.Y. 1977).

## C. *Plaintiffs' State Law Claims*

Based on the same occurrences and same events on which they sue under Section 10b, Rule 10(b)–5, and sections 14(d) and 14(e) of the Williams Act, plaintiffs claim, and insist their evidence shows, that defendants, as

directors, breached their fiduciary duties owed to plaintiffs as shareholders of Marshall Field by maintaining a policy of keeping Field independent, making acquisitions to thwart takeovers they feared would deprive them of their directorships, making misleading statements which included omitting important disclosures, and filing the antitrust suit against CHH. Plaintiffs contend they have proven that defendants rejected CHH's approach concerning a merger, not in the best interests of Field shareholders, but only to preserve their positions as directors of the company. They insist that the hasty and ill-considered decision of defendants deprived them of the opportunity to sell their shares at a premium, first at the suggested figure of $36.00, then at the $42.00 price announced by CHH in its proposed exchange offer.

■ These claims are based on fiduciary principles discussed by the courts of Delaware in *Brophy v. Cities Service Co.*, 31 Del.Ch. 241, 70 A.2d 5 (1949) and *Singer v. Magnavox Co.*, 380 A.2d 969 (Del.Supr. 1977). Since Field is a Delaware corporation, this court must apply the law of that state in determining whether defendants as directors of a corporation have breached any fiduciary duty they owed to the plaintiffs. *Davidge v. White*, 377 F.Supp. 1084, 1088 (S.D.N.Y.1974); *see Scott v. Multi-Amp Corporation*, 386 F.Supp. 44 (D.N.J. 1974). After reviewing the evidence and the law this court has concluded, as a matter of law, that at the close of their case in chief, plaintiffs have not produced evidence which would prove essential elements of the claims they have made under the federal securities statutes and rules. Despite this conclusion, but without deciding whether the federal claims were not insubstantial, the court is of the view that it should exercise its discretion, retain pendent jurisdiction, and determine whether, as to their state law claims, plaintiffs have made a prima facie case. *Parrent v. Midwest Rug Mills, Inc.*, 455 F.2d 123, 129 (7th Cir. 1972); *cf. Rousseff v. Dean Witter & Co.*, 453 F.Supp. 774 (N.D.Ind.1978); *see Forest Laboratories, Inc. v. Pillsbury Company*, 452 F.2d 621 (7th Cir. 1971); *United States ex rel. Crow Creek Sioux Tribe v. Tri-County Bank of Chamberlain, South Dakota*, 415 F.Supp. 858 (D.S.D.1976).

■ The chancellors of the state of Delaware have said that "[t]here is no rule better settled in the law of corporations than that directors in their conduct of the corporation stand in the situation of fiduciaries." *Bodell v. General Gas and Electric Corporation*, 15 Del.Ch. 119, 132 A. 442, 446 (1926) *aff'd* 15 Del.Ch. 420, 140 A. 264 (1927); *see Guth v. Loft, Inc.*, 23 Del.Ch. 255, 5 A.2d 503, 510 (1939). As fiduciaries, directors owe to the corporation and its shareholders the duties of honesty, loyalty, good faith, diligence and fairness; they must act for the benefit of the corporation and its shareholders, and never use their fiduciary positions to further their personal interests. *Singer v. Magnavox Co.*, 380 A.2d 969 (Del.1977). It follows, as a corollary, that corporate directors who negligently waste the assets of the company in buying stock of another corporation, and thus interfere with the rights of shareholders, commit breaches of their fiduciary duties. *Penn Mart Realty Company v. Becker*, 298 A.2d 349 (Del.Ch.1972); *cf. Michelson v. Duncan*, 407 A.2d 211 (Del.Supr. 1979).

In a background memorandum filed to aid the court in understanding their underlying litigation theory in eight of the nine consolidated cases, plaintiffs argue that as to the question of liability of entrenched management that resists takeover attempts solely to perpetuate itself in office, the leading case is *Condec Corporation v. Lunkenheimer Company*, 43 Del.Ch. 353, 230 A.2d 769, 775–776 (1967). After a descriptive statement of what they understood was involved, plaintiffs conclude that "[a]lmost identical [with Condec] are the facts in the instant case."

In their memorandum objecting to defendants' motion for directed verdict, they again cite *Condec Corporation v. Lunkenheimer Company* and say it holds that "[w]here directors have taken actions otherwise lawful but for an improper motive,

such as resisting the acquisition of their corporation out of a desire to perpetuate the present directors' control, Delaware law holds that the directors have breached their fiduciary duty and are outside the protection of the business judgment rule." In view of this reliance on *Condec v. Lunkenheimer*, this court will examine that decision in order to determine whether, as plaintiffs contend, it controls the issues at bar.

*Condec* was a case in which a Delaware court of chancery heard a motion to restrain the use of 75,000 authorized but unissued shares of a target corporation in a way which would have prevented the plaintiff, a tender-offeror, from exercising its rights as a minority shareholder of the target company. Lunkenheimer Company directors, for reasons they could not justify at the hearing for preliminary relief, had rejected Condec's approach toward a merger; but, not to be undone, Condec, through two tender offers, succeeded in obtaining tenders for 191,017 shares of Lunkenheimer stock, a total of 414,000 then being outstanding. It became clear to Lunkenheimer that Condec was going to acquire enough shares to control the company. To prevent this, but without any benefit to the company and its shareholders, Lunkenheimer entered into an agreement with a subsidiary of a company that had evinced an interest in acquiring all of Lunkenheimer's assets, an interest Lunkenheimer approved, whereby it issued to the subsidiary 75,000 shares. The terms of the agreement were such that no money was paid; the sole purpose of the issuance was to thwart Condec's efforts to complete its tender offer and control the company. Without hearing more, the chancellor ruled that a final order would be entered cancelling the 75,000 shares of Lunkenheimer stock.

■ *Condec Corporation v. Lunkenheimer* is the law of Delaware; *see Young v. Valhi, Inc.*, 382 A.2d 1372, 1379 (Del.Ch. 1978); it is cited by Delaware chancellors for the propositions that "shares may not be issued solely to preserve or to gain corporate control" and "corporate action, though technically correct and in compliance with Delaware Corporation Law, may not be undertaken for an inequitable purpose." *Lynch v. Vickers Energy Corporation*, 351 A.2d 570, 575 (Del.Ch.1976), *rev'd on other grounds*, 383 A.2d 278 (Del.Supr.1977). In Delaware, a majority of shareholders of a corporation owes a fiduciary duty to the minority. *Roland International Corporation v. Najjar*, 407 A.2d 1032 (Del.Supr. 1979). Obviously, it is inequitable, and hence a breach of fiduciary duties, for a corporation acting at the instigation of a majority of its shareholders to issue stock, without consideration, solely to prevent a minority shareholder from completing a tender offer that is proceeding in accordance with law. Clearly, *Condec* is distinguishable as to parties, facts, issues, and relief sought. Nothing of the kind that happened in that case is shown in the evidence which plaintiffs have produced in this one.

■ What plaintiffs have shown is that in each instance when a contact or approach was made to Field concerning an acquisition of it by another company, or a possible merger, the proposition was considered by defendants on its merits. Each contact or approach was made a part of the company's records by signed or initialed memoranda, with defendants' actions recorded in board minutes containing appropriate resolutions. Defendants reached their decision as to each approach or contact only after consulting with management, lawyers, accountants, and investment bankers. For reasons that were applicable to each occasion, defendants decided that the suggested acquisition or proposed merger was not in the best interest of Marshall Field, its shareholders, and communities served by the company. These were decisions made in the exercise of business judgment.

The same process, the evidence shows, occurred in connection with the approach made by Carter and Hawley in October 1977. The important difference was the timing of it, and the insensitivity represented by the fact that representatives of CHH appeared to be taking advantage of the

death of an important Field executive, and trying to exploit defendants' employment of Arena, who had just left CHH. There were valid reasons to believe that any merger of Field with CHH would violate the antitrust laws, and the subject, over a period of more than a month, was studied and discussed by Field executives with qualified lawyers. It is true that neither defendants nor the lawyers they consulted communicated with the law firm Carter and Hawley had mentioned; but this was a matter of judgment. Defendants did not breach any fiduciary duty they owed plaintiffs when they acted on the CHH approach.

It is worth remembering that according to plaintiffs' evidence, defendants had never told anyone they were interested in a merger with CHH, or that Field was for sale. Corporations in the kind of business as important as that in which Marshall Field was engaged plan to exist as on-going commercial or merchandising entities. Plaintiffs appear to believe that large companies like Field are developed for takeovers; and that seeing to shareholder opportunities for sale of their shares at a premium is the most important duty of directors who manage publicly owned corporations. Plaintiffs are mistaken; for if they were not, public equity ownership in corporations would be a form of entrepreneurial hazard that few corporations could survive.

As to the acquisitions which defendants authorized Field management to make, Halle's, The Liberty House Stores, and The Galleria in Houston, Texas, each was consummated after defendants considered business projections by management received the advice of lawyers and experts, and consulted with accountants and investment bankers. Despite a great deal of straining with financial data, reports and statistics, plaintiffs have not produced evidence which could prove that any of these acquisitions were unsound business ventures.

The lawsuit Field filed against CHH was authorized by defendants only after they had considered the advice of competent legal counsel who, according to evidence shown to the jury, had reasonable grounds for the litigation that was contemplated. Directors of corporations are entitled to rely in good faith on the advice of experts, including that of legal counsel. *Spirt v. Bechtel*, 232 F.2d 241, 247 (2d Cir. 1956); *Voege v. Magnavox Co.*, 439 F.Supp. 935, 942 (D.Del.1977). The suit was proper; defendants had in good faith and in the exercise of business judgment decided that CHH's proposal toward a merger was illegal, inadequate, and not in the best interests of Marshall Field, its shareholders, and the communities it serves.

Directors of corporations discharge their fiduciary duties when in good faith they exercise business judgment in making decisions regarding the corporation. *Warshaw v. Calhoun*, 221 A.2d 487 (Del. Supr.1966); *Gimbel v. Signal Companies, Inc.*, 316 A.2d 599, 609 (Del.Ch.1974) aff'd 316 A.2d 619 (Del.Supr.1974); see S. Kaplan, *Fiduciary Responsibility in the Management of the Corporation*, 31 Business Law 883 (1976). When they act in good faith, they enjoy a presumption of sound business judgment, reposed in them as directors, which courts will not disturb if any rational business purpose can be attributed to their decisions. *Kaplan v. Goldsamt*, 380 A.2d 556, 568 (Del.Ch.1977). In the absence of fraud, bad faith, gross overreaching or abuse of discretion, courts will not interfere with the exercise of business judgment by corporate directors. *Sinclair Oil Corporation v. Levien*, 280 A.2d 717, 722 (Del.Supr. 1971); *Warshaw v. Calhoun*, 221 A.2d 487 (Del.Supr.1966). There is no evidence in this record on which the jury could find that at any time any defendant in this case committed fraud, was guilty of bad faith, grossly overreached, or abused his discretion in dealing with any property or right of any plaintiff, or a member of the class or subclasses.

Corporate directors have the duty to oppose a takeover offer which they have determined would be detrimental to the interests of the corporation and its shareholders. *Treadway Companies v. Care Cor-*

*poration,* [Current Binder] Fed.Sec.L.Rep. (CHH) ¶ 97,188 (S.D.N.Y.1979). Having so decided in good faith, with rational business purposes attributable to their decision, defendants had not only the right "but the duty to resist by all lawful means persons whose attempt to win control of the corporation, if successful, would harm the corporate enterprise." *Heit v. Baird,* 567 F.2d 1157, 1161 (1st Cir. 1977); *Northwest Industries, Inc. v. B. F. Goodrich Co.,* 301 F.Supp. 706, 712 (N.D.Ill.1969); *Cheff v. Mathes,* 41 Del.Ch. 494, 199 A.2d 548 (Del.Supr.1964).

## IV.

For these reasons, as they have been stated by the court in the subdivisions of this memorandum, each discussing the law applicable to plaintiffs' claims under sections 10b, 14(d), 14(e) of the Securities and Exchange Act of 1934, Rule 10(b)–5 adopted by the Securities and Exchange Commission, and common law claims of alleged breaches of fiduciary duties by defendants, the court concludes that plaintiffs' evidence, considered together with all reasonable inferences favorable to them, totally fails to prove necessary elements of their claims. The facts established by the proof, and the inferences reasonably drawn therefrom, point so strongly and overwhelmingly in favor of defendants that the court is convinced the jury in this case, as reasonable men and women, would not arrive at a verdict contrary to one in defendants' favor.

Therefore, defendants' motion for directed verdict should be granted, without submission of this case to the jury, because this ruling will have the result of saving the mischance of speculation over plaintiffs' legally unfounded claims. Accordingly, the motion for directed verdict is granted and since an order granting a motion for directed verdict is effected without any assent of the jury, it will be discharged; and judgment will be entered on the directed verdict. The clerk will be instructed to enter a judgment in each of these consolidated cases against the plaintiffs and in favor of each defendant, with costs as provided by law.